Jasen, J.
Plaintiff Samantha James is a professional belly dancer whose cabaret performances have placed her figure in the public spotlight. Her pursuit of this exotic specialty aroused a certain public curiosity and prompted the publication of a feature article about her life and trade, complete with photographs, in defendant’s Rochester newspaper. The plaintiff complains that two sentences of this article libeled *418 her and has sued for damages. Special Term granted defendant’s motion to dismiss the complaint. The Appellate Division, two Justices dissenting, reversed and directed a trial on disputed issues of fact. (47 AD2d 437.) We conclude that the sentences complained of are not reasonably susceptible to any defamatory interpretation and that, in any event, the plaintiff, a public celebrity, has failed to state facts sufficient to generate a triable issue on maliciousness of defendant’s publication. In our view, the motion for summary judgment was properly granted by Special Term and we now reverse the order of the Appellate Division.
On July 9, 1972, an article entitled "Samantha’s belly business” appeared in the Sunday supplement, Upstate, of the Rochester Democrat & Chroniclé, a newspaper published by the Gannett Co., Inc. The story, prepared by one of the newspaper’s reporters based upon an interview with the plaintiff, described the plaintiff as the "undisputed queen of the exotic stages of Upstate New York, Rochester’s belly dancer in residence.” Without delving into unnecessary detail, it suffices to note that the four-page story discussed the plaintiff’s background, set forth her views on life in general, her approach to her business, and described two of her dancing routines. Accompanying photographs depicted the plaintiff in her dressing room, on the stage, and arriving for work. Quotations from the interview with plaintiff are sprinkled liberally throughout the article. In one of the opening paragraphs, the writer stated: "A petite (but for her bust), platinum blonde, Samantha vibrates from the 10xl0-foot stage at the Encore Club three times a night, six nights a week.”
The plaintiff finds fault with two sentences in the article, denying that she made statements attributed to her. Specifically, she objects to the statement that "she admits to selling her time to lonely old men with money, for as much as $400 an evening in one case, 'just to sit with him and be nice to him’.” In a later paragraph, the plaintiff is quoted as saying: " 'Most men can talk to me. They can’t talk to their wives because they’re blocked by society. Do you understand what I’m saying? They’re looking for something they’ve lost at home. This is my business. Men is my business.’ ” Of this paragraph, the plaintiff objects only to the phrase, "Men is my business”. The plaintiff does not deny making any of the other quotations attributed to her in the article.
In her complaint, the plaintiff alleged that, by the two *419 sentences cited, "the defendant meant, and intended to mean, and was understood by the readers of said newspaper as meaning that the plaintiff was acting as a prostitute who was offering her body and her time for sale at a price, was committing the crime of prostitution, was committing adultery, was sleeping and having intercourse with various and sundry male persons for a profit; that plaintiff was a person of low and despicable moral character.” The plaintiff claimed that the allegedly false publication discredited her reputation in the community, resulting in damages of $500,000. She also asserted that, as a result of the article, she has not been able to open a planned dancing school, that she has not been able to teach cosmetology and is "in imminent danger” of losing her membership in the American Guild of Variety Artists. Her claims of "special” damage total $135,000. In its answer, the defendant stood by its article, asserting that the plaintiff did make the disputed statements and that her remarks were accurately reported.
We agree with the dissenting Justices at the Appellate Division that the published article, when read in context, was not defamatory. It is old law that written charges imputing unchaste conduct to a woman are libelous per se, obviating the need to allege and prove special damages. (See, e.g., Gates v New York Recorder Co., 155 NY 228, 231; 34 NY Jur, Libel and Slander, §§ 3, 14; see, also, Civil Rights Law, § 77.) However, whether the words complained of would constitute a libel per se or a libel per quod, it is for the court to decide whether the words are susceptible of the meaning ascribed to them. (Tracy v Newsday, Inc., 5 NY2d 134, 136; see Crane v New York World Tel. Corp., 308 NY 470, 479-480; Cafferty v Southern Tier Pub. Co., 226 NY 87.) The court must decide whether there is a reasonable basis for drawing the defamatory conclusion. If the contested statements are reasonably susceptible of a defamatory connotation, then "it becomes the jury’s function to say whether that was the sense in which the words were likely to be understood by the ordinary and average reader.” (Mencher v Chesley, 297 NY 94, 100.) In analyzing the words in order to ascertain whether a question of fact exists for resolution upon trial, the court will not pick out and isolate particular phrases but will consider the publication as a whole. (Julian v American Business Consultants, 2 NY2d 1, 23.) The publication will be tested by its effect upon the average reader. (Sydney v Macfadden Newspaper Pub. *420 Corp., 242 NY 208, 214; Everett v Gross, 22 AD2d 257, 258.) The language will be given a fair reading and the court will not strain to place a particular interpretation on the published words. (See Drug Research Corp. v Curtis Pub. Co., 7 NY2d 435, 440; Julian v American Business Consultants, supra.) The statement complained of will be "read against the background of its issuance” with respect to "the circumstances of its publication”. (Mencher v Chesley, 297 NY 94, 99, supra.) "It is the duty of the court, in an action for libel, to understand the publication in the same manner that others would naturally do. 'The construction which it behooves a court of justice to put on a publication which is alleged to be libellous is to be derived as well from the expressions used as from the whole scope and apparent object of the writer’.” (Cooper v Greeley, 1 Denio 347, 358; More v Bennett, 48 NY 472, 475-476.)
In applying these traditional standards to this case, we find there is absolutely no basis from which the ordinary reader could draw an inference of prostitution from the paragraph containing the statement: "Men is my business”. The thrust of the paragraph, read as a whole with the entire article, was that the plaintiff believed that men attended her shows in order to obtain a form of entertainment not available in their homes. It cannot be said, as a matter of law, that, so construed, these remarks may impute unchastity or prostitution to the plaintiff. Indeed, it is to be expected that the talents of a female belly dancer would generally hold a greater attraction for men than for women and, since the plaintiff’s audience is predominately male, it is but a truism to suggest that men are her business. From the entire article, it is clear that her "business” consists of displaying her dancing ability and does not involve acts of illegality or promiscuity.
The second alleged libel, that plaintiff sold her time to lonely old men, is a bit more difficult. However, we again conclude that this sentence is not susceptible to a defamatory construction. Although, on its face, this portion of the article states that the plaintiff sold her time to men on occasion, the statement itself negates the possibility that the plaintiff was thereby committing an act of prostitution since her role was to do no more than "sit with him and be nice to him”. Whether a publication alleging that a woman sold her time to men charges an act of prostitution depends necessarily upon what services were to be performed in exchange for the money *421 tendered to the woman. (See Hemmens v Nelson, 138 NY 517, 530-531.) For it is plain that many women sell legitimate, professional services, involving an expenditure of personal time, to male customers. Doctors, lawyers, designers, and nurses are but a few examples. Here, the publication does no more than allege that the plaintiff accepted money in return for providing a few hours of companionship to lonely men. There is nothing in the sentence complained of to support an inference that the sale of anything more was involved. Any lingering doubt is resolved by a review of the entire article which establishes that plaintiff is a professional belly dancer who markets her own nightclub act "as an all-but-lost art as much as erotic entertainment.” We conclude that the article, read as a whole, is incapable, as a matter of law, of bearing the libelous meaning that plaintiff would ascribe to it. We reject plaintiff’s attempt to pick at two sentences from a feature article and impute to them a libelous connotation that the whole article, let alone the specific sentences, will not bear.
We believe that plaintiff’s cause of action is defective in a second respect. We conclude that the plaintiff, for the purposes of this publication, was a public personality and that the plaintiff was, therefore, required to allege the existence of facts which would tend to establish that the defendant acted maliciously within the meaning of New York Times Co. v Sullivan (376 US 254.) In the Times case, the Supreme Court held that a public official could not recover for a defamatory falsehood unless he proves that the statement was made with knowledge of its falsity or with reckless disregard for the truth. (376 US, at pp 279-280.) Although there has been some difficulty along the way (see Curtis Pub. Co. v Butts, 388 US 130; see, also, Rosenbloom v Metromedia, Inc., 403 US 29), similar considerations have attached to persons who are "public figures”. (Time, Inc. v Firestone, 424 US 448, 454.) In Gertz v Robert Welch, Inc. (418 US 323, 345), the court defined public figures as persons who "have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite *422 attention and comment.” (See, also, Curtis Pub. Co. v Butts, 388 US 130, 164, supra [concurring opn of Warren, Ch. J.].)
Recently, the court ruled that the wife of a member of a prominent society family was not a public figure so as to trigger the application of the New York Times standard to an article reporting on her divorce. It was held that she had not assumed a role of especial prominence in society at large, had not thrust herself into the forefront of a particular controversy in order to influence its resolution and that her holding of a few press conferences did not convert her into a public figure. (Time, Inc. v Firestone, 424 US 448, 454, n 3, supra.)
The category of "public figures” is of necessity quite broad. Included, without doubt, are many types of public performers such as professional athletes, nightclub and concert singers, television and movie actors, and recording artists. (See Cepeda v Cowles Mags. & Broadcasting, 392 F2d 417, 418-419, cert den 393 US 840.) Although such persons have not necessarily taken an active part in debates on public issues, they remain, nevertheless, persons in whom the public has continuing interest. Some newspaper readers may have a keener interest in following public figures whose activities are reported on the sports or gossip pages than in reading the more straightforward reports in the news section of the local newspaper. Newspapers and magazines of general circulation necessarily report on persons upon whom public interest has fastened in order that the public might be induced to purchase their product. Newspapers cater to the public’s demand for information and if a newspaper does not provide the sought-after information, its readership may well turn to the competition. If the public wants information on public personalities, the newspaper, to survive, must supply it. Fundamentally, the purchase of the newspaper for whatever reason helps sustain its publication and, thus, serves to assure the commercial survival of the newspaper, a matter of concern to all its readers, the followers of the sports as well as the followers of the news.
The essential element underlying the category of public figures is that the publicized person has taken an affirmative step to attract public attention. Of course, not all persons reported upon in the media have sought the publicity. However, there are individuals who, for a variety of reasons, have strived to achieve a measure of public acclaim. Thus, in this *423 case, we have no doubt that the plaintiff co-operated in having the interview with defendant’s reporter and was far from unhappy about any attendant notoriety. Her obvious purpose was to attract customers to the club where she was performing. A larger audience for her performances would be beneficial to her economic interest. In short, the plaintiff welcomed publicity regarding her performances and, therefore, must be held to be a public figure with respect to newspaper accounts of those performances. By her purposeful activity, she thrust herself into the public spotlight and sought a continuing public interest in her activities. (Cf. Curtis Pub. Co. v Butts, 388 US 130, 155, supra [Harlan, J.].)
The extent to which one becomes a public figure is a matter of degree. Those occupying high public office, Congressmen and Judges for example, may, by the nature of their governmental role, invite comments and reports on matters not immediately related to their performance of official duties. In effect, they may become public figures for all purposes. On the other hand, other public figures may invite publicity only with respect to a narrow area of interest, and publications, which unreasonably extend the scope of their reports, may be confronted with a lesser standard of proof. In this case, it suffices to say that plaintiff was a public figure with respect to accounts of her stage performances. Thus, our recent decision in Chapadeau v Utica Observer-Dispatch (38 NY2d 196) is of no assistance to her. In Chapadeau, we were concerned with the rules to be applied to allegedly defamatory statements concerning private individuals involved in matters of public interest. Plaintiff, as we have said, was not, for the purposes of this article, a private individual but was, instead, a public personality.
In her answer to defendant’s bill of particulars, plaintiff claimed that the publication of the defendant was malicious because the reporter refused to review the interview and his notes with the plaintiff and defendant "deliberately refused to allow plaintiff to review said article and pictures”. It would hardly be conducive to a free press to impose a requirement that all persons quoted or mentioned in a publication be permitted to review the report prior to publication. A newspaper is a private enterprise and there is certainly no absolute right on the part of citizens to insist upon the right to inspect newspaper accounts, files or notes in the absence of legal process. A requirement that persons mentioned in proposed *424 newspaper accounts or articles be permitted a first instance, prepublication review, including a review of direct quotations, would, in effect, impose the equivalent of censorship traditionally anathema in our society. Outsiders have no right to sit in the editor’s chair; to insist that an interviewee should be assured an opportunity with the benefit of reflection and hindsight to revise spontaneous statements would be equally to strike at the vitality of news reporting. Moreover, a quick glance at any major daily newspaper would reveal the impracticability of such a requirement. Countless persons, corporations, associations and businesses are mentioned in publications every day and a publication could scarcely remain timely if publication had to await a review and confirmation by every person or entity whose name is mentioned. Moreover, although such a review might alert the publisher to a potential difficulty, the newspaper would be under no requirement to accede to the suggestions or demands of those mentioned in its reports. Newspapers are generally free to publish as they please, subject, of course, to the rare legitimate constraints imposed by law and to liability for any lawfully compensable damage afflicted by published articles. Publications establish their own method of verifying information and the fact that the subject of an article was not offered, prior to publication, an opportunity for review and comment does not, by itself, establish that the publisher acted maliciously or recklessly. Only where the publisher has, or should have had, reasons to doubt the accuracy of the report or its reporter is there a legal duty to make further inquiry. Thus, for example, a failure to investigate a story does not in itself establish the bad faith of the newspaper. (St. Amant v Thompson, 390 US 727, 733.) The appropriate test is whether a publisher had or should have had serious doubt as to the truth of the publication. In other words, it must be established that there were obvious reasons to doubt the veracity of the report. (St. Amant v Thompson, 390 US, at p 732, supra; Trails West v Wolff, 32 NY2d 207, 219.) Here, the plaintiff has pointed to no circumstances which should have placed the publisher on guard. There is no indication that the reporter was not competent to perform his assignment or that the reporter had any reason to submit a false account of the interview. Similarly, the report, on its face, does not contain any statement that would arouse the suspicions of a careful publisher or that would give cause for further inquiry. Indeed, plaintiff admits that all but two sentences of the article were accurate. Under all these circum *425 stances, we conclude that the plaintiff has failed to set forth any facts that would permit the jury to find that defendant acted with knowledge of the article’s falsity or with reckless disregard for its truth.
We conclude that the defendant’s motion for summary judgment was properly granted. Accordingly, the order of the Appellate Division should be reversed and the order of Special Term reinstated. The question certified by the Appellate Division—Was the order of that court properly made?—is answered in the negative.
Chief Judge Breitel and Judges Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order reversed, with costs, and the order of Supreme Court, Monroe County, reinstated. Question certified answered in the negative.