OPINION OF THE COURT
James Gibson, J.
The defendant moves to dismiss for legal insufficiency (CPLR 3211, subd [a], par 7) the complaints in two actions brought to recover damages for alleged libel.[1]
The plaintiffs in Action No. 1 comprise the city firemen’s union and 7 of its officers; and those in Action No. 2 the city police patrolmen’s union and 10 of its officers. The defendant is the city’s Mayor.
The provisions of the applicable labor relations contract between the city and the firemen’s union (art XIII, § 6) relating to leaves of absence for union representatives are, so far as here pertinent, identical with the corresponding provisions of the patrolmen’s contract (there also, art XIII, § 6); the former being as follows: "6. Leaves of Absence for Union Representatives: Union officers, representatives, and delegates will be allowed all released time with pay to participate in negotiations with the employer, adjustment of grievances, arbitrations hearings, and other functions relative to the operation of this agreement. They will also be given leave with pay to attend Union and executive board meetings. Paid leave to participate in and attend conferences and conventions *500 of affiliated unions, associations, and organizations, shall be limited to nine hundred sixty (960) man hours in any year.” Each of the two actions stems from the publication in a Schenectady newspaper of two articles. The first, that of May 20, 1976, reported statements made by the Mayor at a press conference had the day before "that taxpayer subsidized union activities are taking too many public safety workers away from their jobs”[2] — the officials of the patrolmen’s union taking "1,708 hours, or the equivalent of 11 months” — and the firemen’s union officials, "649 hours, or the equivalent of four months of actual man-hours so far this year”. There followed the alleged libel: "He called lioth tallies 'stealing from the taxpayers.’ ” The second article, published June 9, 1976, reported that the Mayor had "asked the City Council’s public safety committee to investigate allegations that heads of city police and fire unions have abused contract provisions that allow paid time-off for union activities” and that in a letter to the committee’s chairman had "complained that he has had to stand alone in his charges that leaders of the public safety unions are 'stealing from the taxpayers.’ ”
The Mayor does not contend that he was not correctly quoted and in neither case do the plaintiffs contend that the Mayor’s count of absences was in error. Thus, the simple issue presented by each action is the meaning and legal effect of the Mayor’s assertions that in taking leaves of absence to the number of man hours indicated by him, the union officials were "stealing from the taxpayers”.
In each complaint it is alleged that, "by the words quoted * * * the defendant meant and intended to mean by those who read or heard them that the plaintiffs were committing crimes, engaged in illegal and unlawful practices, and plaintiffs were guilty of the crime of malfeasance as employees of the City of Schenectady, New York and were unworthy to hold positions of public office and plaintiffs were thereby held up to ridicule and disgrace among their friends, acquaintances and others.” The defendant denies any such connotation, asserting in his moving affidavit in each case, "that by the use of the words 'stealing from the taxpayers’, such language was not used in the generic or legal meaning of the word 'steal’, *501 but as intended that the plaintiffs were indifferent to the taxpayers of the City and were using a great deal of their time for which they were being paid without benefit of the taxpayers or doing the work and performing duties for which they were paid and hired; that the defendant made such remarks without malice which was within his legal qualified privilege in doing a job for which he was elected as Mayor.”
The Court of Appeals in a very recent case has dealt with the issue here presented, holding that "whether the words complained of would constitute a libel per se or a libel per quad, it is for the court to decide whether the words are susceptible of the meaning ascribed to them. * * * The court must decide whether there is a reasonable basis for drawing the defamatory conclusion. If the contested statements are reasonably susceptible of a defamatory connotation, then 'it becomes the jury’s function to say whether that was the sense in which the words were likely to be understood by the ordinary and average reader.’ ” (James v Gannett Co., 40 NY2d 415, 419.)
Outlining the judicial process to be applied in determining the meaning to be ascribed to the words, it is stated: "In analyzing the words in order to ascertain whether a question of fact exists for resolution upon trial, the court will not pick out and isolate particular phrases but will consider the publication as a whole”; and, further, that: "[t]he statement complained of will be 'read against the background of its issuance’ with respect to 'the circumstances of its publication’ ”; and, finally, that the construction " 'is to be derived as well from the expressions used as from the whole scope and apparent object of the writer’.” (James v Gannett Co., supra, pp 419, 420; emphasis supplied.)
Applying these tests, it is to be noted that the occasion for the Mayor’s statements published May 20, 1976 was a press conference and that the subject of the press conference was evidently the adequacy of the police and fire protection afforded the people of the city by the diminished number of men on duty. Indeed, as the news item indicated, certain officers of the patrolmen’s union had themselves complained of a manpower shortage and police department officials had conceded that the department was operating "with a contractual minimum manpower figure”, and this at a time when layoffs of policemen and firemen appeared imminent. Police officials assigned various causes but the Mayor "charged that *502 taxpayer subsidized union activities [were] taking too many public safety workers away from their jobs” and continued: "With unlimited sick leave, unlimited leaves of absence, holidays and vacation time, I just wonder how many law enforcement officers we have on the streets at all times?” The Mayor’s references to "taxpayer subsidized union activities” and to "unlimited leaves of absence” seem to have focused on what he considered the overgenerous or even improvident provisions of the collective bargaining agreement which the city itself had negotiated, and not upon individual delinquencies of police and fire personnel, whose acceptance and exercise of the broad, if not, indeed, "unlimited” privileges conferred upon them by the contract could not well be deemed criminal. The references to the union activities as contractually permitted are too clear and emphatic to be mistaken as accusations of crime. !
The June 9, 1976 news article was prompted by the Mayor’s request for a committee investigation of "allegations that heads of city police and fire unions have abused contract provisions that allow paid time-off for union activities”; and, although there is further reference to "stealing from the taxpayers”, the "contract provisions” again bear the brunt of the attack.
Upon following the guides to which the James decision directs us — being the consideration of the publication as "a whole”, its "background”, an'd the "circumstances” of its issuance, giving thought, at thej same time, both to the particular "expressions” used and to the "whole scope and apparent object” of the speaker — it is clear that the term "stealing from the taxpayers” was not used in the literal sense, with the criminal or other unlawful connotation attributed to it by the complaints. As a matter of ccjmmon knowledge and experience, the expression has become a figure of speech, rather loosely applied to any expenditure of public funds and services to which the speaker bears strong opposition. Then, too, the phrase is often a form of political rhetoric, understood and discounted as such, and not lillely to be misconstrued in this case as an accusation of crime.[3]
*503 Like the comparable colloquialisms "highway robbery” and "license to steal”, the expression carries the connotation of a value judgment, e.g., that, in the words attributed to the Mayor, the contract provisions were being "abused”, rather than a factual assertion of actionable criminal conduct of the nature claimed in the complaints. The contract language being well known to the Mayor, his statements were really in the nature of opinion and of conclusions resting on his interpretation of the language.* *[4]
The determination that the statements were not libelous concludes the case; but were this threshold issue to be resolved in plaintiffs’ favor, defendant’s additional contentions as advanced upon these motions would, in any event, have to be sustained. It seems appropriate to discuss them, if only in broad outline.
As has been indicated, the Mayor’s statements complained of were made, in one case in connection with his request for an investigation by a legislative committee and in the other in the course of a news conference, each an appropriate method of official expression.[5] The defendant Mayor was, of course, an elected official of high rank, and as such was entitled to immunity in some degree, whether limited or absolute.[6] Conversely, the remedy of the plaintiffs was circumscribed — to the extent that recovery could be had only upon pleading and proof of actual malice — by virtue of their status as public figures of great importance within the particular sphere of municipal activity.[7] The Mayor’s communications to the media were for the wholesome purpose of affording to the *504 public relevant information with respect to public safety — a governmental issue of transcendant importance.* [8] The publication of June 9, 1976, moreover, related directly to official investigative action. j
Although the issue is a troublesome one, it must be concluded, on balance, that defendant’s privilege was absolute (Sheridan v Crisona, 14 NY2d 108; Stukuls v State of New York, 53 AD2d 368).
Plaintiffs contend that the Mayor’s functions are legislative only (citing Schenectady City Charter, §§ 8.57, 8.58, but cf. § 8.47) and urge, without citation of authority, that he must, on that account, be restricted to the traditional privilege— established long before the present concept of optional forms of city government — accorded such communications as speeches on the floor of the Legislature and be denied the privilege and exemption accorded an executive officer. Plaintiffs’ argument is not entirely clear, but the Mayor — who is, incidentally, the city’s signatory to both labor contracts — was legally concerned with the budgetary questions and the matters of public safety underlying the controversy.[9]
If, contrary to all the conclusions hereinbefore expressed, it were to be found, first, that the words were defamatory and, second, that their utterance was unprotected by absolute privilege, the defendant could then properly claim only a qualified privilege; but in sucbj case actual malice would have to be pleaded and proved. The complaints in this case, however, contain only conclusory averments of malice. An affidavit in opposition to the motions was submitted in but one of the actions (although leave to plead over was requested in the brief filed in response to born motions), and in the single affidavit filed the factual support urged for the claim of malice (CPLR 3211, subd [e]) was the defendant Mayor’s unquestioned knowledge that the labor contracts authorized absences for the conduct of union business! The defendant’s knowledge of the contract provisions would not, however, imply malice if his statements concerning them were matters of opinion and conclusions interpretive of the contract language, as hereinbe-
i *505 fore (supra, p 503) suggested. In the light of the conclusions hereinbefore stated, the questions as to the adequacy of plaintiffs’ pleading and proof of malice, and as to the sufficiency of plaintiffs’ request to replead, are academic and need not be further explored.
In sum, then, it must be concluded that the statements complained of were not defamatory (1) because, when read in the context of the complete statement, and of all the circumstances, they did not charge the criminality which plaintiffs have elected to make the basis of their actions, and, additionally, (2) because they were, in substance, statements of opinion and of conclusions interpretive of the contract provisions and accordingly nonactionable. If, however, the statements were indeed defamatory, it would have to be held that absolute privilege attached to them. Under the final alternative — that the statements (1) were defamatory and (2) were subject to qualified privilege only — the complaints would have to be held insufficient in failing to set forth factual allegations of malice.
Motions granted.

. Movant’s application for additional relief of a procedural nature is rendered academic by this decision.

. The article quoted the Mayor as follows: " 'Over the past 17 months, the police and fire union leaders charged the taxpayers 43 months for so-called union business,’ Duci told reporters, 'or to put it another way, the union leadership was responsible for denying the taxpayers 7,224 actual manrhours of public safety.’ ”

. The dearth of New York decisions precisely on point prompts citation to out- of-State authority of highly respectable origin: "If one states that a candidate is a thief, without qualification, he communicates a |fact pertaining to his fitness; but it is a slander if untrue, whether it was made in good faith or not, although, had he stated the exact facts, and expressed the opiniori that they amounted to stealing, though *503 they did not technically constitute the offense of larceny, the communication might be privileged.” (Eikhoff v Gilbert, 124 Mich 353, 360.)

. Cf. Gertz v Robert Welch, Inc. (418 US 323, 339-340).

. See Lombardo v Stoke (18 NY2d 394, 399-400, citing Barr v Matteo, 360 US 564).

. Certainly the Mayor of Schenectady occupied no lower an echelon than that of the Town Supervisor in Duffy v Kipers (26 AD2d 127, 129-130).

. It is noted as a matter of common knowledge that relations between municipalities and their public safety employees are presently subject to increasing strain and deterioration, by claims of inadequate manpower, on one hand, and of tax and budget deficiencies, on the other. In consequence, the prominence of the officers of the unions concerned is heightened and their status as "public figures” emphasized. The union leaders, at the time at least, were important public figures no less noteworthy, surely, than the Rochester nightclub entertainer in James v Gannett Co. (40 NY2d 415, supra). As to the requirement that "public figures” — as distinguished from "public officers” of high rank — plead and prove actual malice, see Curtis Pub. Co. v Butts (388 US 130) extending to "public figures” the rule of New York Times v Sullivan (376 US 254).

. Cf. Chapadeau v Utica Observer-Dispatch (38 NY2d 196).

. Noted in passing is the holding that the absolute privilege immunizing statements made by municipal officers in the discharge of official duties is applicable to a borough president in administering public affairs and "also in performing quasi-legislative functions as a member of the Board of Estimate” (Sheridan v Crisona, 14 NY2d 108, 112-113, supra). \