**Victor LASKY, Plaintiff,**

v.

**AMERICAN BROADCASTING COMPANIES, INC.**
**Defendant.**

**No. 83 Civ. 7438 (MJL).**

United States District Court,
S.D. New York.

March 8, 1985.

Fitelson, Lasky, Aslan & Couture, New York City by Clifford Forster, for plaintiff.

Cahill Gordon & Reindel, P.C., New York City by Floyd Abrams, John L. Sander, New York City, for defendant.

### MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

 Plaintiff brought this libel action under the diversity jurisdiction of this Court.[1] He alleges that the defendant American Broadcasting Companies, Inc. ("ABC") televised a documentary entitled the American Inquisition which defamed him in his profession.

Defendant moves to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) contending that the privilege of neutral reportage enunciated in *Edwards v. Audubon Society, Inc.*, 556 F.2d 113 (2d Cir.), *cert. denied,*

---

**1.** Since federal jurisdiction is based upon diversity of citizenship, New York Libel law governs this action except to the extent that it is modified or limited by federal constitutional standards.

434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977) is applicable and in the alternative that the documentary did not defame plaintiff.

### The Broadcast

On June 23, 1983, defendant aired a one hour ABC News "Closeup" documentary entitled "The American Inquisition", ("the Program"), which focused on the stories of Americans caught up in the McCarthy era of the 1950's.[2] Divided into two segments, the Program, in its second half, told the story of the effects of McCarthyism on the town of Fairmont, West Virginia, and its former resident, a Ms. Luella Mundel. In the Program, Ms. Mundel stated that in the early 1950's she was accused of being a security risk and an atheist by the president of the local school board and as a result of these charges, she lost her job as the head of the art department of the local state college. Other persons interviewed on the Program recalled that during this period, the local American Legion held "anti-subversive" meetings in Fairmont that incited people against communism.

Plaintiff, a well known lecturer and writer,[3] attended an American Legion meeting held in Fairmont in 1951. Plaintiff stated on the Program, that at this meeting he gave his usual talk about the dangers of communist infiltration, but that he also advised that the public should not get hysterical about the problem. Ms. Mundel also attended this meeting. Plaintiff stated that during the meeting Mundel stood up and hysterically assailed him; and that he responded to this verbal assault by trying to calm her down.[4] The next speaker on the Program was Newton Michael, who was identified as an American Legionnaire who also attended the 1951 meeting. Mr. Michael stated that:

> "As I recall, Mr. Lasky called her a communist. This seemed to agitate her very much, and she called him a Nazi. And with that he became very, to me, very angry, and she became angry also."

The Program continued with the recollections of several people about the mood in Fairmont in February 1951 and the events that occurred therein. William Manchester, the historian, commented on what had happened to Ms. Mundel in Fairmont and following a commercial break, Mr. Manchester continued as follows:

> Tagged as a Red, she couldn't find a job anywhere. She was running out of money. And in desperation she filed suit for slander against the woman who had called her a security risk.... [5]

Near the Program's conclusion, plaintiff again appeared on camera and stated:

> I have no feeling one way or the other. I feel sorry for her. I feel sorry for her very much. I mean, I didn't have nothing to do with it. I didn't ask her to come to the meeting. I didn't ask her to shoot off her mouth. I have no idea why she was there. She was there with a claque and she rather enjoyed being Joan of Arc. I don't—I didn't set the fire to Joan of Arc.

On July 16, 1983 ABC aired the following:

> MARSHALL FRADY: I'm Marshall Frady for ABC News Closeup. We have a correction to make involving our recent

---

**2.** The transcript of the Program is attached to the complaint as Exhibit A.

**3.** Plaintiff pleads in his complaint that he has been recognized as a responsible but vigorous opponent of the Soviet Union and of communism both in practice and in theory. (Comp. para. 4). This Court on consent dismissed the first claim which alleged plaintiff had been libeled as a private person.

**4.** On the Program, Ms. Mundel also related her impressions of the American Legion meeting and stated that:

> When I got there I thought some of the remarks were asinine. For instance, some speaker referred to *The New York Times* as a pink sheet. I thought that was absurd and I think I said so. There were a number of other comments that were made that I think I challenged.

**5.** According to Ms. Mundel's statements, the woman who called her a security risk was the president of the school board.

documentary called THE AMERICAN INQUISITION about the legacy of the McCarthy era. In one segment, a participant recalled that at a public meeting author Victor Lasky had called a West Virginia college professor, Luella Mundel, a Communist. While we did broadcast Mr. Lasky's general recollection of the meeting, we omitted his specific denial that he had called Miss Mundel a Communist.

VICTOR LASKY: I did not label her a Communist. I never did. And I don't think she would have told you that I did. Or did she? I never labeled her anything. I can't believe I would have labeled her anything—because I have never labeled anybody unless they were a Communist.

MARSHALL FRADY: Based on information available about the incident which occurred in 1951, we believe we were unfair to Mr. Lasky. ABC News regrets the omission.

## DISCUSSION

■ The parties agree that New York State law with the federal constitutional gloss controls. Under New York law words are libelous *per se* if they affect a person in his or her profession by imputing to the person misconduct, incapacity, unfitness or lack of any qualification deemed necessary for the conduct of the profession. In addition when the plaintiff is a public personality,[6] he must plead and prove the existence of facts which tend to prove defendant acted with malice or reckless disregard for the truth, *James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 421, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976) *citing New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

*The Neutral Reportage Doctrine*

■ Although the privilege of neutral reportage is an emerging doctrine whose contours are not easily determined, *See Note, The Developing Privilege of Neutral Reportage*, 69 Va.L.Rev. 853 (1983). *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 67 (2d Cir.1980), where applicable, it is the law of this Circuit. The doctrine first ennunciated in *Edwards v. National Audobon Society, supra*, if applicable to the facts in this case, would hold that the First Amendment protects the accurate and disinterested report of charges made against a public figure regardless of the reporters view as to their validity. Therefore one of the essential findings that must be made before applying *Edwards* is that the publisher did not deliberately distort the report in order to launch a personal attack of his own on a public figure. In other words, the report must be neutral. Judge Friendly quoted at length in footnote 18 of *Cianci* a comment of Professor Sowle that the privilege of neutral reportage should be applied to press coverage of matters of legitimate public concern only if the report presents not just the statement itself but is a balanced report of the debate on the controversy to which the statement is addressed. "Thus, the report of a statement besmirching an individual ... could fall within the privilege only if it is fair to the individual involved in the public issue, presenting his or her side of the story as well as the other." *Id.*

Plaintiff, in opposing the motion to dismiss herein, argues that the selectivity exercised by ABC in determining what material should be left in and what should be left out of the original broadcast undermines the "neutral" component of the privilege. In response, defendant contends that it did present versions of the plaintiff's denial (other than the one broadcast on the July 16 correction) on the original program[7] and relying upon *Reeves v. ABC,*

---

**6.** Plaintiff does not dispute the fact that in his complaint he pleads that he is a public figure who thrust himself into the middle of the anti-communist crusade in order to affect public opinion. Nor is it disputed that it was in this role that plaintiff was invited to West Virginia to address the Legionnaires' meeting.

**7.** Immediately after the Legionnaire stated his recollection of the meeting, Mr. Lasky said:

All I know is that an hysterical woman got up and began to assail me or—and the rest of the speakers. And I had to respond to try to calm her down. If anything I was a calming influ-

719 F.2d 602 (2d Cir.1983) argues that a report may be considered neutral if the average viewer would understand the denials.

Although *Reeves* may be a laboring oar in the ultimate resolution of this case, it is inapplicable on a motion to dismiss this complaint. The *Reeves* Court did not reach the constitutional privilege of neutral reportage (*Id.* at 607) since the case was disposed of on the basis of the California fair and true report of a judicial proceeding statute.[8]

■ I find that at this preliminary stage in the proceedings, in which no answer has been filed or discovery conducted,[9] this Court cannot say that plaintiff can prove no set of facts which will sustain his claim. This ruling is without prejudice to a reconsideration of the asserted privilege at a later stage in this litigation.

*Does the Complaint set forth a claim of libel sufficient to withstand a Rule 12(b)(6) motion?*

Plaintiff alleges that the aim, purpose and effect of the documentary was to depict plaintiff as the person who caused Ms. Mundel's dismissal by maliciously and libelously calling her a communist. (Comp. Para. 28) Further by failing to include in the original broadcast plaintiff's unequivocal denial[10] plaintiff claims defendant portrayed him as a "professionally irresponsi-

ble ... unprincipled, vicious and dispicable person of disreputable character, ready and willing to use lectures on Americanism and the danger of communism to destroy as traitors the livelihoods and lives of Americans innocent of any connection with communism." (Comp. Para. 29).

A motion to dismiss a complaint requires the Court to determine whether the claim as alleged, without regard to the weight of the evidence, and assuming as true all facts pleaded, states a claim for which relief can be granted. The complaint must be deemed sufficient if plaintiff has pleaded a colorable claim of libel. *Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir.1980); *Davis v. Ross*, 754 F.2d 80 (2d Cir.1985). The *Davis* Court, turned to *James*, 40 N.Y.2d at 418, 386 N.Y.S.2d 871, 353 N.E.2d 834, as the controlling libel case in New York. That case set forth three standards for determining the sufficiency of a libel complaint. The beginning of the Court's analysis is to determine whether the publication is susceptible of any one meaning, if so, the Court must then decide if the accused language is libelous as a matter of law. If the Court decides the publication is susceptible of more than one meaning, one of which could be viewed as defamatory, then it is for the trier of fact to determine in what sense the words were used. The three standards set forth by the *Davis* Court are:[11]

---

ence. Believe me, she was hysterical. Ex. A, p. 7.

Toward the end of the Program, Mr. Lasky again appeared and stated that:

I have no feeling one way or the other, I feel sorry for her. I feel sorry for her very much. I mean, I didn't have nothing to do with it. I didn't ask her to come to the meeting. I didn't ask her to shoot off her mouth. I have no idea why she was there. She was there with a claque and she rather enjoyed being Joan of Arc. I don't—I didn't set the fire to Joan of Arc. Ex. A, p. 9.

**8.** *Reeves* involved an ABC news report of a pending Grand Jury and SEC investigation. New York has a similar statute, Civil Rights Law ¶ 74 which is limited, as is the California statute, to a fair and true report of any judicial, legislative or other official proceeding.

**9.** Plaintiff, through discovery, may ascertain facts which would make the privilege inapplicable.

**10.** Specifically, plaintiff alleges that defendant intentionally excluded from the Program, his "unequivocal denial" of the American Legion incident as well as a letter addressed to plaintiff by one of Ms. Mundel's close friends. This denial, as broadcast by defendant on July 16, 1983 stated:

I did not label her a Communist. I never did. And I don't think she would have told you that I did. Or did she? I never labeled her anything. I can't believe I would have labeled her anything—because I have never labeled anybody unless they were Communist.

**11.** *Davis* involved a libel complaint made by a private person. Since the instant case involves a conceded public figure plaintiff, a fourth stan-

1. The Court must consider the publication as a whole and not pick out and isolate particular phrases.

2. The publication should be tested by its effect on the average reader. The Court should neither construe the words with technical precision or strain to place a particular interpretation on them nor should the Court interpret the words in their mildest and most inoffensive sense to hold them non-libelous.

3. The Court should read the accused words against the background of their issuance with respect to the circumstances of their publication and the scope and apparent object of the writer.

It is apparent from this complaint that the plaintiff has not considered the broadcast taken as a whole but has selectively isolated certain passages as disparaging reaching this result often by resorting to innuendo. Plaintiff, in his complaint and his Brief in Opposition repeatedly asserts that the broadcast attributed Ms. Mundel's plight to his alleged accusation that she was a communist. Although the words: "Tagged as a Red, she couldn't find a job anywhere." (Exhibit A to the Complaint, p. 7.) are dramatically stated, the broadcast made it clear who had caused Ms. Mundel's dismissal in its opening lines:

"My name is Luella Mundel, and I was in this courtroom about 30 years ago. *I had been accused of being a security risk and an atheist by the president of the school board, and as a result I lost my job.*" Exhibit A to the Complaint, p. 5 (emphasis added).

The sentence relied upon by plaintiff occurred later in the broadcast. Its meaning becomes clear when it is placed in the context of the two sentences immediately following it. The entire paragraph—the only one with the phrase "Tagged as a Red"— reads as follows:

"Tagged as a Red, she couldn't find a job anywhere. She was running out of money. And in desperation she filed suit for slander against the woman who had called her a security risk, and that woman was to be represented by bible-thumping, flamboyant United States Senator Mansfield Neely of West Virginia." Exhibit A to the Complaint, p. 7.

Read in its entirety and against the background of the earlier Mundel quote, the paragraph plainly, inescapably and indisputably refers not to plaintiff but to the female president of the school board as the one who had caused Mundel's dismissal.

The broadcast was a historical presentation of a period in American life when First Amendment concepts of freedom of thought, speech and association were on a collision course with a widely held public perception that communists were a clear and present danger to the body politic and that this alien conspiracy must be eradicated whenever found. The documentary explored the manner in which a small town in West Virginia tried to preserve the "American way of life."

This Court is of the opinion that under current New York law the alleged Nazi-communist exchange of Lasky and Mundel at the American Legion meeting thirty years ago would not be held defamatory but rather protected speech. *See* discussion by Judge Oakes of First Amendment gloss upon libel law after *New York Times v. Sullivan*, in *Buckley v. Littell*, 539 F.2d 882 (2d Cir.1976).[12]

---

dard must be added under *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, *viz*, that the complaint must plead that the defamatory matter was published with malice. Because plaintiff has pleaded malice, this fourth standard will require no further discussion. *Charles Atlas Ltd. v. Time-Life Books, Inc.*, 570 F.Supp. 150–155 (S.D.N.Y.1983).

**12.** Judge Oakes explained in *Buckley v. Littell, supra,* at p. 888 that the Supreme Court in *New York Times* and subsequent holdings has recognized that the law of libel "has enormous First Amendment implications ... which may constitute an intrusion upon the prohibitions of that Amendment. The law of defamation has in effect been *rewritten* in light of the Constitutional imperatives." The central interest of a court, Judge Oakes stated, is to examine the whole record so as to assure that the judgment does not constitute a forbidden intrusion on the field of free expression.

The recollections of Mr. Lasky, Ms. Mundel, Legionnaire Michael and others concerning the American Legion meeting presented a vivid picture of a community gathering, enlivened by a forceful speaker, discussing a matter of paramount public concern. Legionnaire Michael recalled that both Mr. Lasky and Ms. Mundel engaged in a shouting match in which Lasky called Mundel a communist and she called him a Nazi. It is precisely this type of exchange which has been characterized in the law of libel as the expression of opinion, or more specifically, epithets which express a speaker's emotions rather than assertions of fact. Such name calling, in the context of public debate, is protected speech because of the "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open and ... it may well include vehement, caustic and sometimes unpleasant sharp attacks." *New York Times v. Sullivan*, 376 U.S. at 270, 84 S.Ct. at 720. Such speech has been characterized in other opinions by the Supreme Court as "no more than rhetorical hyperbole, a vigorous epithet ... *Greenbelt Cooperative Publishing Assn. v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 1541, 26 L.Ed.2d 6 (1970), or "a lusty and imaginative expression ... of contempt," *Letter Carriers v. Austin*, 418 U.S. 264, 286, 94 S.Ct. 2770, 2782, 41 L.Ed.2d 745 (1974).

In *National Association of Government Employees v. Central Broadcasting*, 396 N.E.2d 996 (Mass.1979) *cert. denied*, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980) the Court explained that accusing another of being a communist is not libel when it occurs in the midst of public debate in which voices are expected to be raised in sloganeering invective. In any event even if we were to assume the alleged Lasky accusation was defamatory of Ms. Mundel, such a finding would not advance the analysis of this complaint since Mr. Lasky, not Ms. Mundel, is the plaintiff. The gravemen of plaintiff's complaint is that the defendant broadcast a false assertion that plaintiff had maliciously called Ms. Mundel a communist for the purpose, aim and ef-fect of showing that plaintiff was responsible for her discharge and subsequent unemployment while omitting to publish, at the same time, plaintiff's alleged denial of the accusation and that defendant had possession of a letter showing plaintiff was sympathetic to Ms. Mundel.

The strength of the complaint's allegations are not factors for this Court to consider at this time. The office of a motion under Rule 12(b)(6) is solely to determine the legal feasibility of the complaint. *Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980). Although this Court finds that plaintiff's assessment of the broadcast is strained, this Court cannot say as a matter of law that the Program is susceptible of only one meaning nor can we say that it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim. Although defendant correctly observes that the *Geisler* Court's decision was in the context of deciding the "of and concerning" element of a libel claim, which is traditionally a factual issue, the latest case in this Circuit, *Davis*, has cautioned the district courts of the narrow lense through which it must look when viewing a libel complaint under a Rule 12(b)(6) focus.

For the above reasons, defendant's motion to dismiss the complaint under Fed. R.Civ.P. 12(b)(6) is denied. Plaintiff seeks counsel fees alleging that defendant's motion is frivolous and groundless. This application is denied. The issues raised by defendant were not only meritorious but caused this Court considerable concern. It was only after this Court was apprised of the *Davis v. Ross*, litigation pending before the Second Circuit that this Court decided to await that decision before deciding the motion herein.

Defendants' motion to dismiss the complaint is in all respects denied, plaintiff's motion for counsel fees is in all respects denied.

It Is So Ordered.