**CHURCH OF SCIENTOLOGY INTERNATIONAL, Citizens' Commission on Human Rights, Plaintiffs,**

v.

**ELI LILLY & CO., PaineWebber Inc., and Ronald Nordmann, Defendants.**

**No. 90 Civ. 7009 (MJL).**

United States District Court, S.D. New York.

Oct. 25, 1991.

Morrison Cohen Singer & Weinstein by Jonathan W. Lubell, New York City, for plaintiffs.

Dewey Ballantine by Harvey Kurzweil, New York City, for defendant Eli Lilly & Co.

Cravath Swaine & Moore by Alan J. Hruska, New York City, for defendants PaineWebber Inc. and Ronald Nordmann.

## OPINION AND ORDER

LOWE, District Judge.

Before this Court are the motions of defendants Eli Lilly & Co. ("Lilly"), PaineWebber, Inc. ("PaineWebber"), and Ronald Nordmann ("Nordmann") to dismiss the above-captioned action pursuant to Fed. R.Civ.P. 12(b)(6). For the reasons set forth below, the motion of Lilly is granted, and the joint motion of PaineWebber and Nordmann is denied.

## BACKGROUND

### Procedural Background

This is an action for defamation brought by Church of Scientology International ("CSI") and Citizens' Commission on Human Rights ("CCHR"). Plaintiffs are non-profit corporations incorporated in California, having their principal places of business in California. Defendant Lilly is a pharmaceutical company incorporated in Indiana, having its principal place of business in Indiana. Defendant PaineWebber is a stock brokerage and securities firm incorporated in Delaware, having its principal place of business in New York. Defendant Nordmann is a market analyst employed by PaineWebber, and a citizen of New York. Complaint at ¶ 1.

In their Complaint of 10/31/90, plaintiffs allege that defendants defamed them in the total amount of $40,200,000, *id.* ¶ 39, by publishing two false and defamatory statements, of and concerning plaintiffs, on PaineWebber's database, with reckless disregard for the truth or falsity of the statements. On 12/6/90 defendants PaineWebber and Nordmann filed a motion, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the complaint for failure to state a claim for which relief can be granted. Memorandum of Defendants PaineWebber and Nordmann in Support of Their Motion to Dismiss the Complaint ("PaineWebber Memo"). On the same day, defendant Lilly filed a separate motion to dismiss, adopting PaineWebber's grounds and also making an alternate argument of its own. Memorandum of Defendant Lilly in Support of its Motion to Dismiss the Complaint ("Lilly Memo").

On 12/21/90 this Court referred this action to Magistrate Judge Nina Gershon pursuant to 28 U.S.C. § 636(b)(1)(B). In her Report and Recommendation of 3/28/91 ("Report"), Magistrate Judge Gershon advised dismissal of this action in its entirety. Report at 9. Plaintiffs CSI and CCHR filed a timely objection, disputing the reasoning and conclusion of the Magistrate Judge. These objections, along with defendants' responses, are now before this Court.

Under the Federal Rules the District Court is required to make a de novo determination of those issues in the Magistrate Judge's report to which objections are made in writing. "The district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate with instructions." Fed.R.Civ.P. 72(b). For the reasons discussed below, we affirm the Magistrate Judge's Report with respect to defendant Lilly, but reverse the Report with respect to defendants PaineWebber and Nordmann.

*Factual Background*

On July 18, 1990 the *Wall Street Journal* featured an article entitled "Prozac Said to Spur Idea of Suicide," describing the controversy over the anti-depressant medication Prozac, which is manufactured by Lilly. The subject of the article was a lawsuit filed against the drug company, alleging that the drug "caused [a New York woman] to commit acts of self-destruction and to make attempts at suicide." Ex. A to Complaint. The article described "a Los Angeles-based consumer organization associated with the Church of Scientol-

ogy" which collected the complaints of patients taking Prozac, and subsequently identified this group as CCHR. The article described Lilly's response as "[believing that] some of the complaints are being drummed up by the Scientology group, which has a history of criticizing the use of psychiatric drugs." *Id.*

The following day, Nordmann, a market analyst for PaineWebber who followed Lilly stock, wrote an Advisory responding to the *Journal* article and recommending continued purchase of Lilly stock, despite the concern of investors. Complaint at ¶ 9. Plaintiffs allege that Nordmann was acting in the scope of his employment when he authored the statements, and that "the Advisory was prepared for, published by and distributed on PaineWebber's nationwide communications system to PaineWebber's sales personnel, customers and others, and all of PaineWebber's branch offices." *Id.* ¶¶ 7, 15. The advisory described Prozac's success and Lilly's "highly ethical promotion practices," which included regular updates of package inserts. Ex. B to Complaint. In this context Nordmann wrote the statements of which plaintiffs complain:

"The final addition to Prozac's package insert in May concerned one case of 'violent behavior.' In this case, a depressed man taking Prozac committed mass murder. *Interestingly, this man, Mr. Wes Becker (sic), happened to be a member of the Church of Scientology. The Church and other related special interest groups have, in our opinion been on a vendetta to discredit Prozac."* [1] (Emphasis added).

---

**1.** The entire text of Nordmann's Advisory of July 19, 1990 reads:

"An article in yesterday's (7/18) edition of the *Wall Street Journal* regarding Prozac is the cause of significant investor concern. The article discusses a lawsuit filed against [Lilly] by a New York woman who charges that Prozac 'caused her to commit acts of self-destruction and to make attempts at suicide'. In our opinion, investors should not be unduly concerned, and we recommend purchase of [Lilly] shares on weakness. We retain our Buy (1) rating on the stock. Due to the stock's dramatic appreciation in recent months, it is not surprising to see some inves-

tors locking in profits now and asking questions about Prozac's safety later."

"Prozac has been utilized by more than two million depressed patients worldwide since it was first introduced in 1988. Its sales have risen dramatically from $125 million that year to $350 million in 1989. Sales in 1990 are expected to exceed $700 million. The drug should comfortably surpass the $1 billion mark in 1991 and become one of the ten largest selling drugs in the world. The lay press has given the drug a great deal of publicity. For example, Prozac has graced the cover of both *Newsweek* and *New York* magazines. Because of the company's history with

According to the Complaint, these statements "were told to Nordmann by an employee of Lilly within the scope of the employee's employment" for the purpose of having Nordmann publish the statements, in order to shore up Lilly's stock in the wake of the worrisome *Journal* piece. *Id.* ¶ 10.

Plaintiffs maintain that both these statements are false: Wesbecker was never a member of CSI, and neither plaintiffs nor any other Scientology organization is "on a vendetta" against Lilly's drug. *Id.* ¶¶ 12, 13. On October 31, 1990 plaintiffs commenced the instant action.

## DISCUSSION

■ In her Report, Magistrate Judge Gershon correctly states the liberal standard of review for a motion to dismiss pursuant to Rule 12(b)(6): "[T]he complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiffs can prove no set of facts in support of their claim which would entitle them to relief." Report at 4 (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). For purposes of this motion, the court looks solely at the complaint and its exhibits. Fed.R.Civ.P. 10(c). The plaintiffs' allegations are taken as true, with the caveat that a bald, unsupported allegation is insufficient to pass the pleading threshold. 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 318 (2d ed. 1990). The court may find that a plaintiff's complaint, though neither artful nor of great specificity in its claim, states within its text a theory of law upon which plaintiffs may

Oraflex, an overpromoted arthritis drug that was removed from the market following a number of deaths, it has not 'touted' Prozac, in our opinion. The drug was initially introduced and promoted only to mental health professionals, primarily psychiatrists. Highly ethical promotional practices have been employed by [Lilly] throughout the drug's short time on the market."

"We understand that every reported side effect on (sic) Prozac is immediately relayed to the FDA by the company for incorporation in the drug's package insert and prescribing information. In fact, Prozac's label was just routinely updated in May to incorporate a few additional adverse reactions. One case of reversible pancreatitis was added as were six cases of 'suicidal ideation' first reported by a Harvard University research psychiatrist in the February issue of the *American Journal of Psychiatry*. These patients reportedly had 'intolerable anxiety in which thoughts of self-destruction were a natural consequence'. According to a recently published text on the subject, the annual rate of suicide for depressed patients is 22–36 times higher than the rate for the general population. Consequently, the Harvard report included in the aforementioned medical journal should not come as a surprise to mental health professionals. The final addition to Prozac's package insert in May concerned one case of 'violent behavior'. In this case, a depressed man taking Prozac committed mass murder. Interestingly, this man, Mr. Wes Becker (sic), happened to be a member of the Church of Scientology. The Church and other related special interest groups have, in our opinion, been on a vendetta to discredit Prozac."

"It is important that investors separate the medical facts from sensationalism in the lay press. To date, more than two million depressed people have been greatly aided by Prozac therapy. Reported serious side effects have been minimal and in proportion to other antidepressants. The FDA is fully aware of the 'suicidal ideation' issue. Dr. Paul Leber, Chief of the FDA's Division of Neuropharmacological Products, stated that 'At present, our reporting system hasn't picked up (suicidal thoughts) as a problem more common than might be expected in this population of users, especially give the drug's high rate of use'. Prozac use is growing dramatically. We estimate that total prescriptions for the drug in the U.S. surpassed 1·million in the month of June alone. considering, its extensive use in the depressed population, it is not surprising to encounter an unusual adverse reaction periodically. We believe the 'suicidal ideation' issue is of primary importance primarily to the financial community. We doubt that the medical community will seriously consider decreasing its use".

"The information contained herein is based on sources we believe to be reliable, but its accuracy is not guaranteed. PaineWebber Incorporated and/or Rotan Mosle, Inc. and/or Mitchell Hutchins Asset Management Inc., Affiliated Companies and/or their officers, directors, employees or stockholders may at times have a position, including an arbitrage or option position, in the securities described herein and may sell or buy them to or from customers. These customers may from time to time act as consultant to a company being reported upon."

Ex. B to Complaint.

Nordmann's term "other related special interest groups," in the third paragraph, clearly refers to CCHR, the particular Scientology group identified in the *Journal* article.

be permitted to proceed with their cause of action. 5A *id.* § 1356, at 296.

■ The issue before this Court is whether plaintiffs CSI and CCHR have stated something more than an accusation as to each element of the tort of defamation under the laws of New York. "The complaint must be deemed sufficient if plaintiff has pleaded a colorable claim of libel." *Lasky v. American Broadcasting Companies,* 606 F.Supp. 934, 938 (S.D.N.Y.1985), (citing *Davis v. Ross,* 754 F.2d 80 (2d Cir.1985).[2] The four elements are: a false and defamatory statement of and concerning plaintiff; publication to a third party; fault, the degree of which depends upon the status of the libelled party; and special harm or per se actionability. *Angio Medical Corp. v. Eli Lilly & Co.,* 720 F.Supp. 269, 272 (S.D.N.Y.1989).

■ The first element, defamatory meaning, is discussed at greater length below. As to the second element, publication to a third party, the computerized PaineWebber Advisory was, by its nature, published to third parties. As to the third element, fault, the Complaint alleges the highest level which could possibly be required.[3] With regard to the fourth element, special harm, under New York law, words are libel per se if they "affect a person in his or her profession by imputing to the person misconduct, incapacity, unfitness or lack of any qualification deemed necessary for the conduct of the profession." *Lasky,* 606 F.Supp. at 937; *Davis,* 754 F.2d at 82. As plaintiffs' Complaint articulates, this action

meets this requirement, therefore special damages do not have to be pleaded. Complaint at ¶¶ 33, 37. All other elements of an action for defamation being recognizable, we are left to determine the issue of defamatory meaning.

*Susceptibility to Defamatory Meaning*

In this case the primary issue of law in dispute is the existence of defamatory meaning in the PaineWebber Advisory. This Court disagrees with Magistrate Judge Gershon and finds that the statements could reasonably convey a defamatory meaning.

■ Whether the statements are reasonably susceptible of a defamatory connotation is a question of law for the court. First, the court decides whether the words are susceptible of one or more meanings to the average reader. *Davis,* 754 F.2d at 82. If they are ambiguous, then the court decides if one of these meanings could be defamatory. *Id.* If so, it is a question of fact for the jury as to which meaning was the one actually understood by readers of the statements. *Lasky,* 606 F.Supp. at 938.

The principle of construction in New York is summed up in *Lasky:*

"1. The Court must consider the publication as a whole and not pick out and isolate particular phrases."

"2. The publication should be tested by its effect on the average reader. The Court should neither construe the words

---

**2.** The parties dispute whether the substantive law of New York or California applies to plaintiffs' claim. Nevertheless, they have agreed that, for purposes of the pending motions to dismiss, the law of both states is the same.

**3.** As this Court did in *Lasky,* we find the standard for pleading fault satisfied on the face of the complaint. *Id.* at 938–39 n. 11. Under *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny, a libel plaintiff who is a public figure must plead actual malice. *James v. Gannett,* 40 N.Y.2d 415, 420–21, 353 N.E.2d 834, 838–39, 386 N.Y.S.2d 871, 875 (1976) (relying on *New York Times v. Sullivan*). This standard is satisfied by pleading reckless disregard for the truth. *Contemporary Mission, Inc. v. New York Times*

*Co.,* 665 F.Supp. 248 (S.D.N.Y.1987). Whether or not a person or an organization is a public figure is a question of law for the court to decide. 353 N.E.2d at 839–40, 386 N.Y.S.2d at 875–76. While this court does not take judicial notice as such of the public controversy surrounding Prozac, as defendants PaineWebber and Nordmann request, PaineWebber Memo at 6–8, *James* stands for the proposition that plaintiffs' appearance in the *Journal* article grants them this status. Furthermore, the visibility of plaintiffs, by their own admission "the Mother Church of the Scientology religion," Complaint at ¶ 3, and "a public-service (sic), investigatory agency," *id.* ¶ 37, easily subjects their allegation to this high standard. Plaintiffs have satisfied this standard in Paragraph 11 of their Complaint and elsewhere in the pleadings.

with technical precision or strain to place a particular interpretation on them, nor should the Court interpret the words in their mildest and most inoffensive sense to hold them non-libelous."

"3. The Court should read the accused words against the background of their issuance with respect to the circumstances of their publication and the scope and apparent object of the writer." *Id.* at 939.

Magistrate Judge Gershon agreed with defendants that the defamatory meanings alleged by plaintiffs are unreasonable. While Magistrate Judge Gershon made a technically logical dissection of the sentences and their meanings, this Court finds that the statements, in juxtaposition and in context, are reasonably susceptible of a defamatory connotation. Thus, we find that the statements must be submitted to a jury for a determination of whether the ordinary and average person would understand these words as defamatory.

### Constitutional Protection of Opinion

Under the standards of the Federal Constitution, certain statements of opinion are protected under the First Amendment. "[W]hether a statement constitutes a personal opinion or a statement of fact is a question of law for determination by the court." *Davis*, 754 F.2d at 85. Under the federal standard, recently enunciated in *Milkovich v. Lorain Journal Co.*, — U.S. ——, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), we find that defendants' statements are not exempted from actionability by the First Amendment.

The three parts of the federal standard are: the plain import or common meaning of the specific words used; whether the statements are capable of verification for truth or falsity; and the context or type of speech. Only a particular type of speech is protected: "rhetorical hyperbole, vigorous epithets, and lusty and imaginative expression ... [I]nstances where the [Supreme Court] ha[s] determined that the imprecise language and unusual setting would signal the reasonable observer that no actual facts were being conveyed about

an individual." *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 244, 567 N.E.2d 1270, 1274, 566 N.Y.S.2d 906, 910 (1991).

Applying the *Milkovich* standard in *Immuno*, New York's highest court stated, "[t]he key inquiry is whether challenged expression, however labeled by defendant, would reasonably appear to state or imply assertions of objective fact." *Id.* 567 N.E.2d at 1273, 566 N.Y.S.2d at 909. If an underlying fact, concerning plaintiffs and capable of being proven false, is suggested by the statement, then the statements at issue are not classified as opinion, and therefore not shielded from actionability. As with the determination of defamatory meaning, the circumstances of the statements are also considered in this inquiry: "In determining whether speech is actionable, courts must additionally consider the impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person." *Id.* 567 N.E.2d at 1273–74, 566 N.Y.S.2d at 909–10.

Applying the *Milkovich/Immuno* standard to the facts of this case, we find that Nordmann's two statements plainly assert two facts: 1) that Wesbecker was a member of CSI, and 2) that CSI and associated organizations were pursuing a hostile critique of Prozac. While the latter accusation may be somewhat more vague and difficult to prove than the first, the public nature of CCHR's activities and the public profile of the Prozac controversy indicate that this is also a factual dispute with a determinable answer. The general tenor of the Advisory was a partisan one, but it purported to be the true story of the Prozac 'suicidal ideation' issue. Nordmann advised, in his professional capacity, that investors who sought to cash in on their lucrative Prozac investments were selling unwisely. ("Due to the stock's dramatic appreciation in recent months, it is not surprising to see some investors locking in profits now and asking questions about Prozac's safety later." Ex. B to Complaint.)

Furthermore, the context is substantially equivalent to an internal memo, and its tone is business-like and solemn. *Compare Immuno,* 567 N.E.2d 1270, 566 N.Y.S.2d 906 (letter to the editor). Although subjective in tone, the commentary purports to be based on actual facts, and to be pointing out their implications, not to be making a personal prediction or hyperbolic characterization. The impression created by these words in the mind of a reasonable person could be that they were purporting to state the truth of the matter, not merely the author's opinion.[4]

*Failure to State a Claim as to Lilly*

■■■■ This Court agrees with the Magistrate Judge that plaintiffs have failed to adequately allege that Lilly made the statements at issue. Plaintiffs allege only that the statements at issue, written by Nordmann, "were told to Nordmann by an employee of Lilly within the scope of the employee's employment." Complaint at ¶ 10.

Plaintiffs fail to provide both the context and the precise language of these statements, or to further identify their author. Neither sentence is attributed by Nordmann to anyone in particular. The language of each sentence is subjective on its face, and therefore gives the impression of having been created solely by Nordmann. For example, the choice of the word "interestingly" to qualify the alleged CSI membership of Wesbecker connotes an idea of the author's own. More significantly, on its face the second sentence could not have been communicated by Lilly, because "[b]y definition, Lilly could not be the author of PaineWebber's opinion." Lilly Memo at 10.

Without more precision in the pleadings, plaintiffs attribution of Nordmann's Advisory, written as a PaineWebber report on one product manufactured by an independent client, is on its face mere speculation as to Lilly's role in the Advisory's making. Such conclusory allegations will not survive a motion to dismiss for failure to state a claim.

## CONCLUSION

Plaintiff's Complaint can be construed as setting forth a claim of defamation as to defendants PaineWebber and Nordmann only. Defendant Lilly's motion to dismiss the Complaint for failure to state a claim is therefore granted. Defendant PaineWebber's and defendant Nordmann's motion to dismiss the Complaint for failure to state a claim is denied.

It Is So Ordered.

---

**4.** The *Immuno* court's *Milkovich*-directed federal review was corroborated on independent state constitutional grounds. *Immuno,* 567 N.E.2d at 1272, 566 N.Y.S.2d at 908. While pronouncements of the New York Court of Appeals are binding on this Court for actions brought under diversity jurisdiction, we do not find it necessary or appropriate to reach the state constitutional question at this juncture. The *Immuno* court was divided on the proper approach to these so-called dual constitutional questions, and the majority acknowledged that it has analyzed protected speech questions in a variety of ways. There is a range of possible choices for this Court in terms of New York elaborations on the federal standard. *Id.,* 567 N.E.2d at 1278–79, 1282 n. 6, 566 N.Y.S.2d at 914–15, 918 n. 6. None of these appear to this Court, without the benefit of briefing by the parties, to be embraced in New York to the exclusion of the others.

Additionally, although plaintiffs have indicated that they accept the choice of New York law as opposed to California law, as previously stated, this is solely for the purposes of the motion to dismiss. Given the satisfaction of the federal constitutional standard, as discussed above, and the remaining opportunity to consider this issue, if necessary, since this Court has elected not to dismiss this claim in its entirety, deferral of state law review of the constitutional question is appropriate at this juncture. If at a later stage of the proceedings this issue again presents itself, this Court will consider it in detail at that time.