**Wing F. CHAU and Harding Advisory LLC, Plaintiffs,**

v.

**Michael LEWIS, Steven Eisman, and W.W. Norton & Company, Inc., Defendants.**

**No. 11–CV–1333 (GBD).**

United States District Court, S.D. New York.

March 29, 2013.

Steven Francis Molo, Robert Kelsey Kry, MoloLamken, LLP, New York, NY, for Plaintiffs.

Celia Goldwag Barenholtz, Gabriel Virgil Rauterberg, Cooley Godward Kronish LLP, David A. Schulz, Levine, Sullivan, Koch & Schulz, LLP, New York, NY, Michael D. Sullivan, Levine Sullivan Koch & Schulz, L.L.P., Washington, DC, for Defendants.

### MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, District Judge.

Plaintiffs Wing F. Chau and Harding Advisory LLC commenced this action against Defendants Michael Lewis, Steven Eisman, and W.W. Norton & Company, alleging that Defendants committed libel by publishing twenty-six defamatory statements about Plaintiffs in Lewis's 2010 book, *The Big Short: Inside the Doomsday Machine.* Plaintiffs seek compensatory and punitive damages for the alleged defamation. Defendants each move for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56.

Defendants' summary judgment motions are GRANTED.

### BACKGROUND

Defendant Lewis is an award-winning author who has written or edited fourteen

non-fiction books. Defendants' Consolidated Statement of Undisputed Facts ("SUF") ¶¶ 14, 18 (filed under seal). He has also written numerous articles and opinion pieces on business and financial topics for publications such as *The New York Times, The Wall Street Journal, Forbes*, and *Vanity Fair. SUF* ¶ 17. Defendant Norton is a New–York based publishing house that has published eleven of Lewis's books. *SUF* ¶ 32. In October 2009, Lewis entered into a contract with Norton for publication of *The Big Short. SUF* ¶ 34. *The Big Short* was a product of sixteen months of extensive research and investigation, during which Lewis interviewed over one hundred sources and collected thousands of pages of hardcopy materials. *SUF* ¶¶ 60–62.

Written as a non-fiction book meant for a general audience, *The Big Short* purports to be an exploration of "the causes of the recent financial crisis by looking at a small group of iconoclasts who 'shorted,' or bet against, the subprime mortgage bond market at a time when most investors thought real estate prices would continue to rise (*i.e.*, were 'long')." *Lewis Decl.* ¶¶ 15–16. One of the "iconoclasts" whom Lewis profiles is Defendant Eisman, who managed a hedge fund called FrontPoint Partners LLC, and served as one of the sources Lewis interviewed in researching *The Big Short. Compl.* ¶ 8.

The gravamen of Plaintiffs' complaint stems from Chapter 6 of *The Big Short*, entitled *Spider–Man at the Venetian.* Of the 270–page, ten-chapter book, Chapter 6 consists of twenty-four pages and revolves around a dinner conversation that took place on January 28, 2007 at the Okada Restaurant in the Wynn Las Vegas Hotel during the 2007 American Securitization Forum. *SUF* ¶ 1. The dinner was hosted by Greg Lippmann, head of Deutsche Bank's Asset–Backed Securities Trading Department, with the purpose of introducing the "shorts" to the "longs". *SUF* ¶ 6. Participants of the dinner included Eisman, FrontPoint's chief trader, Daniel Moses, and FrontPoint's senior analyst Vincent Daniel. *SUF* ¶¶ 3–5.

Also present at the dinner was Plaintiff Chau, a financial professional and founder, president, and 99% owner of Plaintiff Harding, an asset management firm that specialized in the management of CDOs. *SUF* ¶¶ 2, 82, 83, 86. After having had an annual salary of approximately $190,000 as an employee of New York Life insurance company, Chau collected approximately $25 million in fees in 2007 as a CDO manager. *SUF* ¶¶ 90–91. At the height of the CDO market, Harding ranked among the top CDO managers. *SUF* ¶ 117. During the period between January 2007 and September of 2007, Harding issued more asset-backed CDOs by volume than any other CDO manager. *SUF* ¶ 122. As of October 2007, Harding had over $23 billion in assets under management, over half of which consisted of non-prime residential mortgage-backed securities ("RMBS") and CDOs invested in non-prime RMBS. *SUF* ¶ 99–101.[1] By January 2009, the majority of the collateral in Harding's CDOs was rated below BBB, a rating which carried the highest level of risk for investment-grade loans. *SUF* ¶ 104. From as far back as January 2007, Chau personally had minimal equity interest in any of these CDOs. *SUF* ¶¶ 107–113.

At the dinner, Eisman and Chau were seated next to each other and discussed how for every "long" investor who believed CDOs. *SUF* ¶ 87–88.

---

1. Harding received management fees primarily based on the volume of assets in their

the asset would perform, there must be also be a "short investor" on the other side of the trade who believed that the asset would default. *SUF* ¶ 8. Following the dinner, Eisman intended to "short" Chau's CDOs, and contacted a trader at Deutsche Bank to do so upon his return to New York. *SUF* ¶¶ 10. While Eisman did not ultimately short Chau's CDOs specifically, he increased his short position on other CDOs as a result of the dinner. *SUF* ¶ 13.

Chapter 6 criticizes and presents a negative portrayal of Plaintiffs and CDO managers in general. Plaintiffs assert that: Defendant Lewis is liable for writing, Defendant Norton for publishing, and Defendant Eisman for communicating to Lewis the following twenty-six allegedly defamatory statements published in Chapter 6 of *The Big Short*:[2] *Compl.* ¶ 89.

1. When Eisman asked exactly what Harding Advisory advised, Wing Chau explained that he was a CDO manager. **"I had no idea there was such a thing as a CDO manager,"** said Eisman. **"I didn't know there was anything to manage."** ("Statement 1"), *The Big Short* at 138.

2. He'd graduated from the University of Rhode Island, earned a business degree at Babson College, and **spent most of his career working sleepy jobs at sleepy life insurance companies**—but all that was in the past. ("Statement 2"), *Id.* at 139.

3. Danny didn't know Wing Chau, but when he heard that he was the end buyer of subprime CDOs, he knew exactly who he was: **the sucker.** ("Statement 3"), *Id.* at 139.

4. When they saw that Lippman had seated Eisman right next to **the sucker,** both Danny and Vinny had the same thought: Oh no. This isn't going to end well. Eisman couldn't contain himself. **He'd figure out the guy was a fool,** and let him know it, and then where would they be? **They needed fools; only fools would take the other side of their trades.** ("Statement 4"), *Id.* at 139.

5. Later, **when ever Eisman set out to explain to others the origins of the financial crisis, he'd start with his dinner with Wing Chau.** Only now did he fully appreciate the central importance of the so-called mezzanine CDO—the CDO composed mainly of triple-B-rated subprime mortgage bonds—and its synthetic counterpart: the CDO composed entirely of credit default swaps on a triple-B-rated subprime mortgage bond. "You have to understand this," he'd say. **"This was the engine of doom."** He'd draw a picture of several towers of debt. The first tower was the original subprime loans that had been piled together. At the top of this tower was the triple-A tranche, just below it the double-A tranche, and so on down to the riskiest, triple-B tranche—the bonds Eisman had bet against. The Wall Street firms had taken these triple-B tranches—the worst of the worst—to build yet another tower of bonds: a CDO. A collateralized debt obligation. The reason they'd done this is that the rating agencies, presented with the pile of bonds backed by dubious loans, would pronounce 80 percent of

---

**2.** The challenged statements that Plaintiffs claim are defamatory are reproduced in full here for analysis within their immediate context. The Court also has bolded the portions of each challenged statement that could arguably be read as derogatory to Plaintiffs.

the bonds in it triple-A, These bonds could then be sold to investors—pension funds, insurance companies—which were allowed to invest only in highly rated securities. It came as news to Eisman that **this ship of doom was piloted by Wing Chau and people like him.** ("Statement 5"), *Id.* at 140.

6. The guy controlled roughly $15 billion, **invested in nothing but CDOs** backed by the triple-B tranche of a mortgage bond or, as Eisman put it, **"the equivalent of three levels of dog shit lower than the original bonds."** ("Statement 6"), *Id.* at 140.

7. **All by himself, Chau generated vast demand for the riskiest slices of subprime mortgage bonds,** for which there had previously been essentially no demand. This demand led inexorably to the supply of new home loans, as material for the bonds. The soy sauce in which Eisman double-dipped his edamame was shared by **a man who had made it possible for tens of thousands of actual human beings to be handed money they could never afford to repay.** ("Statement 7"), *Id.* at 140–41.

8. As it happened, FrontPoint Partners had spent a lot of time digging around in those loans, and knew that the default rates were already sufficient to wipe out Wing Chau's entire portfolio. "God," Eisman said to him. "You must be having a hard time." "No," **Wing Chau said. "I've sold everything out."** ("Statement 8"), *Id.* at 141.

9. It made no sense. The CDO manager's job was to select the Wall Street firm to supply him with subprime bonds that served as the collateral for CDO investors, and then to vet the bonds themselves. The CDO manager was further charged with monitoring the hundred or so individual subprime bonds inside each CDO, and replacing the bad ones, before they went bad, with better ones. That, however, was mere theory; in practice, the sorts of investors who handed their money to Wing Chau, and thus bought the triple-A-rated tranche of CDOs—German banks, Taiwanese insurance companies, Japanese farmers' unions, European pension funds, and, in general, entities more or less required to invest in triple-A-rated bonds—did so precisely because they were meant to be foolproof, impervious to losses, and unnecessary to monitor or even think about very much. **The CDO manager, in practice, didn't do much of anything, which is why all sorts of unlikely people suddenly hoped to become one.** ("Statement 9"), *Id.* at 141.

10. **"Two guys and a Bloomberg terminal in New Jersey" was Wall Street shorthand for the typical CDO manager.** ("Statement 10"), *Id.* at 141.

11. **The less mentally alert the two guys, and the fewer the questions they asked about the triple-B-rated subprime bonds they were absorbing into their CDOs, the more likely they were to be patronized by the big Wall Street firms.** ("Statement 11"), *Id.* at 141.

12. The whole point of the CDO was to launder a lot of subprime mortgage market risk that the firms had been unable to place straightforwardly. **The last thing you wanted was a CDO manager who**

asked lots of tough questions. ("Statement 12"), *Id.* at 141.

13. The bond market had created what amounted to a **double agent—a character who seemed to represent the interests of investors when he better represented the interests of Wall Street bond trading desks.** ("Statement 13"), *Id.* at 141–42.

14. To assure the big investors who had handed their billions to him that he had their deep interests at heart, the CDO manager kept ownership of what was called the "equity," or "first loss" piece, of the CDO—the piece that vanished first when the subprime loans that ultimately supplied the CDO with cash defaulted.... **Now, almost giddily, Chau explained to Eisman that he simply passed all the risk that the underlying home loans would default on to the big investors who had hired him to vet the bonds.** ("Statement 14"), *Id.* at 142.

15. But the CDO manager was also paid a fee of 0.01 percent off the top, before any of his investors saw a dime, and another, similar fee, off the bottom, as his investor received their money back. That doesn't sound like much, but, when you're running tens of billions of dollars with little effort and no overhead, it adds up. Just a few years earlier, Wing Chau was making $140,000 a year managing a portfolio for the New York Life Insurance Company. **In one year as a CDO manager, he'd taken home $26 million, the haul from half a dozen lifetimes of working at New York Life.... His job was to be the CDO "expert," but he actually** didn't spend a lot of time worrying about what was in CDOs. ("Statement 15"), *Id.* at 142.

16. **His goal, he explained, was to maximize the dollars in his care. He was now doing this so well that, from January 2007 until the market crashed in September, Harding Advisory would be the world's biggest subprime CDO manager.** ("Statement 16"), *Id.* at 142.

17. Among its other achievements, Harding had established itself as the **go-to buyer of Merrill Lynch's awesome CDO machine, notorious not only for its rate of production** (Merrill created twice as many of the things as the next biggest Wall Street firm) **but also for its industrial waste (its CDOs were later proven to be easily the worst).** ("Statement 17"), *Id.* at 142.

18. "He 'managed' the CDOs," said Eisman, "but managed what? I was just appalled that the structured finance market could be so insane as to allow someone to manage a CDO portfolio without having any exposure to the CDOs. People would pay up to have someone 'manage' their CDOs—**as if this moron was helping you. I thought, *You prick, you don't give a fuck about the investors in this thing*.**" ("Statement 18"), *Id.* at 142–43.

19. **Chau's real job was to serve as a new kind of front man for the Wall Street firms he "hired"; in**vestors felt better buying a Merrill Lynch CDO if it didn't appear to be run by Merrill Lynch. ("Statement 19"), *Id.* at 143.

20. "Then he says something that blew my mind," said Eisman. "He says, **'I love guys like you who short my market. Without you I don't have anything to buy.'**" ("Statement 20"), *Id.* at 143.

21. That's when Steve Eisman finally understood the madness of the machine. He and Vinny and Danny had been making these side bets with Goldman Sachs and Deutsche Bank on the fate of the triple-B tranche of subprime mortgage-backed bonds without fully understanding why those firms were so eager to accept them. **Now he was face-to-face with the actual human being on the other side of his credit default swaps.** Now he got it: The credit default swaps, filtered through the CDOs, were being used to replicate bonds backed by actual home loans. *There weren't enough Americans with shitty credit taking out loans to satisfy investors' appetite for the end product.* Wall Street needed his bets in order to synthesize more of them. **"They weren't satisfied getting lots of unqualified borrowers to borrow money to buy a house they couldn't afford,"** said Eisman. **"They were creating them out of whole cloth. One hundred times over!** That's why the losses in the financial system are so much greater than just the subprime loans. That's when I realized they needed us to keep the machine running. I was like, *This is allowed?*" ("Statement 21"), *Id.* at 143.

22. Wing Chau didn't know he'd been handpicked by Greg Lippmann to persuade Steve Eisman that the **people on the other end of his credit default swaps were either crooks or morons,** but he played the role anyway. ("Statement 21"), *Id.* at 144.

23. Between shots of sake he told Eisman that **he would rather have $50 billion in crappy CDOs than none at all, as he was paid mostly on volume.** ("Statement 23"), *Id.* at 144.

24. **He told Eisman that his main fear was that the U.S. economy would strengthen, and dissuade hedge funds from placing bigger bets against the subprime mortgage market.** (Statement "24"), *Id.* at 144.

25. But when the meal was over, they watched Eisman grab Greg Lippmann, point to Wing Chau, and say, **"Whatever that guy is buying, I want to short it."** Lippman took it as a joke, but Eisman was completely serious: **He wanted to place a bet specifically against Wing Chau.** "Greg," Eisman said, "I want to short his paper. Sight unseen," Thus far Eisman had bought only credit default swaps on subprime mortgage bonds; **from now on he'd buy specifically credit default swaps on Wing Chau's CDOs.** ("Statement 25"), *Id.* at 144.

26. **Upon their return they raised it to $550 million, with new bets against the CDOs created by Wing Chau.** With only $500 million under management, the position now overwhelmed their portfolio. ("Statement 26"), *Id.* at 159.

## LEGAL STANDARD

Summary judgment is appropriate where the evidence, viewed in the light most favorable to the non-moving party,

shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c); Vacold, L.L.C. v. Cerami,* 545 F.3d 114, 121 (2d Cir.2008). The burden rests upon the moving party to show that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is "material" only where it will affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For there to be a "genuine" issue about the fact, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether there is a genuine issue of material fact, the Court is required to resolve all ambiguities and draw all inferences in favor of the non-moving party. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir.2004). Where there is no evidence in the record "from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact," summary judgment is proper. *Catlin v. Sobol,* 93 F.3d 1112, 1116 (2d Cir.1996).

## DEFAMATION

■ A plaintiff may recover in libel where his or her reputation is harmed by written statements that "tend[ ] to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number in the community." *Levin v. McPhee,* 119

F.3d 189, 195 (2d Cir.1997) (quoting *Tracy v. Newsday, Inc.,* 5 N.Y.2d 134, 136, 182 N.Y.S.2d 1, 155 N.E.2d 853 (1959)). Not every unpleasant or uncomplimentary statement, however, is defamatory. To establish a libel claim in New York, a plaintiff must establish five elements: (1) a written defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault, established by demonstrating either negligence or malice depending on the libeled party's status [3]; (4) falsity of the defamatory statement; and (5) special damages or *per se* actionability. *Celle v. Filipino Reporter Enters.,* 209 F.3d 163, 176 (2d Cir.2000); *see, e.g., Church of Scientology Int'l v. Eli Lilly & Co.,* 778 F.Supp. 661, 666 (S.D.N.Y.1991); *Angio–Medical Corp. v. Eli Lilly & Co.,* 720 F.Supp. 269, 272 (S.D.N.Y.1989); *Restatement (Second) of Torts* β 558, at 155 (1977). The words are to be construed in the context of the book as a whole, and "in the same way that the reading public, acquainted with the parties and the subject matter would take [them]." *Sydney v. MacFadden News. Pub. Corp.,* 242 N.Y. 208, 214, 151 N.E. 209.

## I. STATEMENTS OF OPINION

■ Most of the twenty-six statements contained in Chapter Six of *The Big Short* constitute non-actionable expressions of opinion. Plaintiffs contend that all of the statements are assertions of fact that may properly serve as a basis for libel claims. Whether challenged statements constitute opinions or facts is a legal question to be decided by the Court. *Rinaldi v. Holt,*

**3.** The Court need not address the issue of fault by making any determination as to whether Plaintiffs are public figures, which would require Plaintiffs to demonstrate that Defendants acted with constitutional malice, or private figures, which would require Plaintiffs to show that Defendants acted in a grossly irresponsible manner, since Plaintiffs can-

not prevail under either analysis. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *see also Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Chapadeau v. Utica Observer–Dispatch, Inc.,* 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (N.Y.1975).

*Rinehart & Winston,* 42 N.Y.2d 369, 366 N.E.2d 1299, 1306, 397 N.Y.S.2d 943 (N.Y. 1977); *see, e.g., Gross v. New York Times Co.,* 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 817, 623 N.E.2d 1163, 1167 (1993); *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901, 904, 501 N.E.2d 550, 553 (1986).

■■ It is a well-established principle of constitutional law that, while states may not offer a lesser degree of protection than the United States Constitution, they are free to erect stronger safeguards. *See, e.g., Immuno AG. v. Moor–Jankowski,* 77 N.Y.2d 235, 248, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991). The New York Court of Appeals has consistently found that the New York Constitution affords greater protection for statements of opinion than its federal counterpart. *See, e.g., Levin v. McPhee,* 917 F.Supp. 230, 240 (S.D.N.Y. 1996). Under New York law, "falsity is a *sine que non* of a libel claim and since only assertions of fact are capable of being proven false, ... a libel action cannot be maintained unless it is premised on published assertions of fact." *Brian v. Richardson,* 87 N.Y.2d 46, 51, 637 N.Y.S.2d 347, 350, 660 N.E.2d 1126, 1129 (1995).

■ New York courts have recognized that "[d]istinguishing between assertions of fact and non-actionable expressions of opinion has often proved a difficult task." *Brian,* 87 N.Y.2d at 51, 637 N.Y.S.2d at 350, 660 N.E.2d at 1129. In conducting this analysis, the Court considers four factors:

(1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might "signal to readers or listeners that what is being read or heard is likely to be opinion, not fact."

*Steinhilber,* 68 N.Y.2d at 292, 508 N.Y.S.2d 901, 501 N.E.2d 550 (*quoting Ollman v. Evans,* 750 F.2d 970, 983 (D.C.Cir.1984)). The third and fourth factors require the Court to "consider the content of the communication as a whole, as well as its tone and apparent purpose", *Brian,* 87 N.Y.2d at 51, 637 N.Y.S.2d 347, 660 N.E.2d 1126; *see also Steinhilber,* 68 N.Y.2d at 293, 508 N.Y.S.2d 901, 501 N.E.2d 550, and "determine whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff," *Immuno,* 77 N.Y.2d at 254, 566 N.Y.S.2d 906, 567 N.E.2d 1270. In this exercise, the Court must avoid the " 'hypertechnical parsing' of written and spoken words for the purpose of identifying 'possible facts' that might form the basis of a sustainable libel action," *Gross,* 82 N.Y.2d at 156, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (*citing Immuno,* 77 N.Y.2d at 256, 566 N.Y.S.2d 906, 567 N.E.2d 1270).

■ The analysis does not end, however, when a challenged statement is found to be an opinion. Where such a determination is made, the Court must decide whether the opinion is a "pure opinion" or a "mixed opinion":

An expression of pure opinion is not actionable.... A "pure opinion" is a statement of opinion which is accompanied by a recitation of the facts upon which it is based. An opinion not accompanied by such a factual recitation may, nevertheless, be "pure opinion" if it does not imply that it is based upon undisclosed facts. When, however, the

statement of opinion implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, it is a "mixed opinion" and is actionable. The actionable element of a "mixed opinion" is not the false opinion itself—it is the implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking.

*Steinhilber,* 68 N.Y.2d at 289–90, 508 N.Y.S.2d 901, 501 N.E.2d 550. In *Silsdorf v. Levine,* 59 N.Y.2d 8, 462 N.Y.S.2d 822, 449 N.E.2d 716 (1983), *cert. denied,* 464 U.S. 831, 104 S.Ct. 109, 78 L.Ed.2d 111 (1983), the court considered a plaintiff's allegation that a statement of opinion was based upon disclosed facts that were actually false. *See id.,* 59 N.Y.2d at 13–14, 462 N.Y.S.2d at 825–26, 449 N.E.2d at 719–20. The *Silsdorf* court concluded that where a plaintiff challenges the veracity of only the opinions, and not the underlying facts, the plaintiff cannot establish libel. *See id.,* 59 N.Y.2d at 14, 462 N.Y.S.2d at 825–26, 449 N.E.2d at 719–20. However, where the plaintiff challenges the opinions *and* the facts, the plaintiff may proceed with respect to both the opinions and the facts. *See id.,* 59 N.Y.2d at 10 & 14–15, 462 N.Y.S.2d at 823, 825–26, 449 N.E.2d at 717, 719–20; *see also H & R Indus., Inc. v. Kirshner,* 899 F.Supp. 995, 1010–11 (E.D.N.Y.1995).

**A. Context of the Challenged Statements**

██ It is appropriate to begin the Court's analysis of the challenged statements with a careful examination, as required by *Steinhilber,* of both the broader social context surrounding *The Big Short's* publication and the more immediate textual context in which the statements are embedded. It is now common knowledge that, from late 2007 to 2009, the United States was devastated by the worst economic recession since the Great Depression. *The Big Short* was published in 2010, as the nation was still reeling from the aftermath of the crisis. Notwithstanding its contemporaneous nature, *The Big Short* was far from a "heat-of-the-moment publication". *600 W. 115th St. Corp. v. Von Gutfeld,* 80 N.Y.2d 130, 142, 589 N.Y.S.2d 825, 603 N.E.2d 930 (N.Y.1992) (making a distinction between a publication that arises out of some deliberation and one that arises out of the heat of the moment to determine whether an ordinary reader would construe statements therein to be a fact or opinion). To the contrary, it was a product of more than a year and a half of extensive research and investigation, during which Lewis interviewed over one hundred sources and accumulated thousands of pages of hardcopy materials.

That Lewis's publication was a book, as opposed to a newspaper or a magazine, is relevant to the Court's analysis;

> Books provide an environment for expression far less restrictive than that of a weekly newsmagazine. In a long book which need not report current factual events, an author has the freedom to develop a thesis, conduct research in an effort to support the thesis, and publish an entirely one-sided view of people and events. A reader of such a book not only expects to find opinion but probably is in active search of opinion; a discussion of history without synthesis and analysis has little intellectual content.

*Price v. Viking Penguin, Inc.,* 676 F.Supp. 1501, 1509 (D.Minn.1988) (*aff'd* 881 F.2d 1426 (8th Cir.)). While it is categorized as non-fiction, *The Big Short* is written in a narrative style and clearly represents Lewis and Eisman's own views with respect to the reasons for the financial meltdown. Lewis makes liberal use of quotes from his characters, as well as analogies

and figurative speech, to offer his perspective on the circumstances that played a role in bringing about the crisis. The book does not purport to serve as a definitive history of the recession, nor does it read as such. An average reader would easily determine that *The Big Short* represents Lewis's one-sided view of the people and events related to the collapse of the financial markets. Moreover, the criticisms and negative opinions personally expressed by Eisman toward CDO managers in general, and Chau individually, are clearly his own personal perspective.

### B. Statements About Plaintiffs (Statements 1–4, 7, 15, 17–19, 22)

■ Most of the challenged statements are non-actionable opinions that pertain specifically to Chau and Harding. In Statement 1, Eisman states his unfamiliarity with the role of a CDO manager: "I had no idea there was such a thing as a CDO manager.... I didn't know there was anything to manage." *The Big Short* at 138. Statements that contain phrases such as "I had no idea" and "I didn't know" "signal to readers ... that what is being read ... is likely to be opinion, not fact." *Steinhilber*, 68 N.Y.2d at 292, 508 N.Y.S.2d 901, 501 N.E.2d 550 (quoting *Ollman*, 750 F.2d at 983); *see also, Kirch v. Liberty Media Corp.*, 04 Civ. 667(NRB), 2004 WL 2181383, at *6, 2004 U.S. Dist. LEXIS 19228, at *21 (S.D.N.Y. Sept. 27, 2004) (interview contained indicators such as "I believe ..." and "I'd say ..." which signaled opinion), *aff'd* in part, *rev'd* in part on other grounds, 449 F.3d 388 (2d Cir.2006). Eisman's statement that he "had no idea there was such a thing as a CDO manager" and "didn't know there was anything to manage" represents his lack of prior knowledge about the existence and work of CDO managers and thus remains entirely his own opinion.

■ In Statement 2, Lewis describes Chau as having "spent most of his career working sleepy jobs at sleepy life insurance companies." *TBS* at 139. Here, the word "sleepy" is an ambiguous term that lacks any precise meaning and cannot objectively be proven true or false. *See Steinhilber*, 68 N.Y.2d at 292, 508 N.Y.S.2d 901, 501 N.E.2d 550. Plaintiffs allege that the statement taken as a whole is a factual assertion because Chau "either spent 'most of his career' at insurance companies or he did not." Pl. Mem. at 49. In context, however, this characterization merely reflects Lewis's opinion of Chau's prior employment experience. An average reader would not interpret this statement literally. It is clearly meant to contrast his prior experience unrelated to his current job as a CDO manager.

■ Likewise, epithets such as "sucker", "fool", and "frontman" as used in Statements 3, 4, and 19 represent precisely the type of hyperbolic language that lacks precise meaning and is incapable of being proven true or false. *See e.g., Buckley v. Littell*, 539 F.2d 882, 893–94 (2d Cir.1976) (terms such as "fascist," "fellow traveller of fascism" and "radical right" held to be "tremendously imprecise[ ]" and "so debatable, loose and varying, that they are insusceptible to proof of truth or falsity"), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 786, 50 L.Ed.2d 777 (1977); *Weiner v. Doubleday & Co., Inc.*, 142 A.D.2d 100, 105, 535 N.Y.S.2d 597, 600 (1st Dep't 1988) (the phrase "big, fat ugly Jew" was found to be a "mere epithet" and non-actionable) *aff'd*, 74 N.Y.2d 586, 550 N.Y.S.2d 251, 549 N.E.2d 453 (1989), *cert. denied*, 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 498 (1990); *Ram v. Moritt*, 205 A.D.2d 516, 612 N.Y.S.2d 671 (2d Dep't 1994) (holding that statements made regarding the plaintiff, including "liar," a "cheat," and a "debtor," constituted personal opinion and

rhetorical hyperbole, not objective fact); *Dillon v. City of New York*, 261 A.D.2d 34, 38, 704 N.Y.S.2d 1 (1st Dep't 1999) ("Loose, figurative, or hyperbolic statements, even if deprecating the plaintiff are not actionable.").

Defendants' statements that Chau "didn't spend a lot of time worrying about what was in CDOs", that he "played the role" of a "crook[ ] or moron[ ]", and that he "[didn't] give a [f——] about the investors" (Statements 15, 18, and 22) are all allegations that lack precise meaning.[4] None of these statements would be understood by an average reader to be anything more than the speaker's own personal opinions. For similar reasons, the statement that Harding was Merrill Lynch's "go-to buyer" of its "awesome CDO machine, notorious not only for its rate of production ... but also for its industrial waste" (Statement 17) is non-actionable opinion.

Statement 7 communicates Lewis's belief that Harding's CDOs can be traced back to "tens of thousands" of improvidently issued home loans based on the size of plaintiffs' assets under management ("AUM"). This statement consists of a theory, not an assertion of fact, and hence is not actionable. *See Levin*, 119 F.3d at 197 ("When the defendant's statements, read in context, are readily understood as conjecture, hypothesis or speculation, this signals the reader that what is said is opinion, and not fact."). When looking at the book as a whole, no reader would determine that Defendants were primarily asserting statements of fact

which could objectively be proven true or false.

### C. Statements Regarding Plaintiffs' Investments (5–6, 21)

Defendants also correctly argue that Defendants' statements about Chau's CDO investments constitute non-actionable opinions. In Statement 5, Lewis describes Eisman's growing understanding of the important role of CDOs in bringing about the financial crisis. Using Eisman's own characterization of the makeup of CDOs as the "engine of doom", Lewis writes that "this ship of doom was piloted by Wing Chau and people like him." Statement 21 pertains to Eisman's understanding of how the credit default swaps operate. This statement is a pure opinion that does not imply that it is premised on any undisclosed set of facts. It merely represents Eisman and Lewis's own thesis of the origins of the financial crisis.

Plaintiffs allege that Defendants's statement that they invested roughly $15 billion in "nothing but CDOs backed by the triple-B tranche of a mortgage bond" (Statement 6) is a "precise factual assertion about the supposedly uniformly poor makeup of Harding's CDOs." Pl. Mem. at 49. To the extent that Eisman considers those CDOs to be the "worst of the worst" and "dog sh——", however, the statement is a non-actionable pure opinion.[5]

### D. Statements About CDO Managers Generally (Statements 9–13)

Defendants also assert that several of the challenged statements made about CDO managers generally are non-

---

**4.** The factual assertion in Statement 18, "a CDO portfolio without having any exposure to the CDOs" is also non-actionable by virtue of being substantially true. Plaintiffs had only nominal equity in their CDOs. Because their exposure was only nominal, the gist of State-

ment 18 that they had very little exposure to the CDOs, is true.

**5.** Furthermore, that a significant portion of Plaintiffs' collateral in its CDOs was rated triple-B is not in dispute. *See* CAC ¶ 99–104.

actionable opinions. In Statements 10 and 11, Lewis writes that " '[t]wo guys and a Bloomberg terminal in New Jersey' was Wall Street shorthand for the typical CDO manager," and that "[t]he less mentally alert the two guys, and the fewer the questions they asked about the triple-B-rated subprime bonds they were absorbing into their CDOs, the more likely they were to be patronized by the big Wall street firms." The language here clearly indicates that the reader is encountering Defendants' opinion. Similarly, no reasonable reader would interpret Statements 9 and 12 to be more than opinionated criticism. Such statements have no way of being verified as true or false and thus cannot qualify as factual assertions. Finally, the characterization of a CDO manager as "a double agent" (Statement 13) is not-actionable.

### E. Statement About FrontPoint's Investment Strategy After Meeting Chau (Statements 25)

▮ The challenged statement pertaining to Eisman's stated decision to short Chau's CDOs are also non-actionable opinions. In Statement 25, Lewis describes a conversation in which Eisman specifically communicates his intentions to Lippman immediately following the dinner. The statement reflects Eisman's personal reaction to his encounter with Chau, as well as the financial decision he considered making as a result of that meeting. Thus, Lewis's portrayal of the statement, and the statement itself, remain pure opinions incapable of supporting a libel claim.

### II. STATEMENTS THAT ARE COMPLETELY OR SUBSTANTIALLY TRUE

▮ Under New York law, "truth is an absolute, unqualified defense to a civil defamation action." *Croton Watch Co., Inc. v. Nat'l Jeweler Magazine, Inc.*, No.

06 Civ. 662, 2006 WL 2254818, at *5 (S.D.N.Y. Aug. 7, 2006). Whether a given statement is true or false is not a binary assessment. Some statements are held to be non-actionable because they are completely true. *Jewell v. NYP Holdings, Inc.*, 23 F.Supp.2d 348, 367 (S.D.N.Y.1998). Other statements are held to be substantially true because they do not possess any ambiguity as to their truth, even if they are not completely true. *Id.* at 368. A third type of statement is held to be substantially true where " ... the admitted truth becomes more tenuous, but still the overall 'gist' or 'sting' cannot be said to be 'substantially' different." *Id.* (citing *Guccione*, 800 F.2d at 302–03). Statements are held to be not substantially true where the difference between the statement and reality is "plainly substantial." *Id.*

▮ A substantially true statement may serve as a defense against a charge of libel. *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 302 (2d Cir.1986). Only the gist or substance of the statements needs to be true. *Biro v. Condé Nast*, 883 F.Supp.2d 441, 458 (S.D.N.Y.2012). A statement is substantially true and "not actionable if the published statement could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation." *Guccione, 800 F.2d at 302; see Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 146 (2d Cir.2001) ("Substantial truth turns on the understanding of the 'average reader.' ")

An examination of the full context of the *The Big Short* shows that many of the allegedly defamatory statements about the plaintiffs are completely or substantially true, and are therefore not actionable under New York law.

### A. Completely True Statements (Statements 16, 25)

▮ The assertion in Statement 16 that "[Chau's] goal ... was to maximize

the dollars in his care" is a true statement of fact. While Plaintiffs dispute this statement to the extent that it suggests that this was Chau's only goal, *SUF* ¶ 84, the statement does not convey, or purport to convey, the priority or importance of this goal to Chau. The second factual assertion in Statement 16—"that, from January 2007 until the market crashed in September, Harding Advisory would be the world's biggest subprime CDO manager"—is also completely true and undisputed. *SUF* ¶ 122. The factual assertion in Statement 23 that "[Chau] was paid mostly on volume" is similarly true and undisputed. *SUF* ¶ 88.

## B. Substantially True Statements (Statements 6, 8, 14, 15, 20, 24)

▮ The assertion in Statement 6 that "[Chau] controlled roughly $15 billion, invested in nothing but CDOs backed by the triple-B tranche of a mortgage bond" is substantially true. It is undisputed that over 50% of the $23 billion that Harding managed as of October 2007 consisted of non-prime RMBS and CDOs invested in non-prime RMBS, and that by January 2009, the majority of the collateral in Harding's CDOs was already rated below BBB. The gist of Statement 6, that Plaintiffs had a substantial amount of money—billions of dollars—invested in CDOs backed by the triple-B tranche of a mortgage bond, is true.

▮ Likewise, the factual assertion in Statement 8, that Chau "sold everything out", is substantially true. It merely conveys that Chau had very little personal equity in the CDOs he managed. Similarly, the assertion in Statement 14, that "almost giddily, Chau explained to Eisman that he simply passed all the risk that the underlying home loans would default on to the big investors" is substantially true. Although whether or not Chau actually said this may be in dispute, the statement itself communicates the undisputed statement that Chau had little personal exposure to the CDOs he managed.

▮ Statement 15, in which Lewis states that "Wing Chau was making $140,000 a year managing a portfolio for the New York Life Insurance Company", and that "in one year as a CDO manager, he'd taken home $26 million", is also substantially true. Plaintiffs do not dispute that Harding received over $25 million in fees in 2007 after Chau was making approximately $190,000 per year while working at New York Life. *SUF* ¶ 90, 91. The overall gist of these assertions, that Chau was making significantly more money as a CDO manager than he did as an insurance company portfolio manager with a previous employer, is an undisputed fact.

▮ The underlying factual assertions, or the gist of them, in Statements 20 and 24 are the same: for every "short" investor, there must be a "long" investor. Regardless of whether or not Eisman correctly attributed Chau as saying that he "love[s] guys like [Eisman] who short [his] market, because he would have nothing to buy without them," and that "his main fear was that the U.S. economy would strengthen, and dissuade hedge funds from placing bigger bets against the subprime mortgage market", those statements are substantially true.

## III. STATEMENTS NOT OF AND CONCERNING PLAINTIFFS (Statements 1, 9, 10, 11, 12, 13, 21)

▮ A plaintiff asserting a libel claim has the burden of proving that an allegedly defamatory statement is "published of and concerning the plaintiff." *Julian v. American Business Consultants, Inc.*, 2 N.Y.2d 1, 17, 155 N.Y.S.2d 1, 137

N.E.2d 1 (1956); *see Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir.2006). While this requirement is generally an issue of fact for the jury, the Court may decide this question as a matter of law where the statements "are incapable of supporting a jury's finding that the allegedly libelous statements refer to a plaintiff." *Anyanwu v. Columbia Broad. Sys. Inc.*, 887 F.Supp. 690 (S.D.N.Y.1995) (citing *Handelman v. Hustler Magazine, Inc.*, 469 F.Supp. 1048, 1050 (S.D.N.Y.1978)). The Court must determine whether, upon reading the statements, it would be clear that the plaintiff was the target of the allegedly libelous statement to those who know him or her. *Church of Scientology Intern. v. Time Warner Inc.*, 806 F.Supp. 1157, 1160 (S.D.N.Y.1992). *See Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 925 (2d Cir.1987) ("It is not necessary that all the world should understand the libel.")

New York courts have routinely held that a plaintiff cannot sustain a libel claim if the allegedly defamatory statement "referenced the plaintiff solely as a member of a group." *Church of Scientology*, 806 F.Supp. at 1157; *see, e.g., New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). To overcome this group libel doctrine, plaintiff must show that "the circumstances of the publication reasonably give rise to the conclusion that there is a particular reference to the member." *Church of Scientology*, 806 F.Supp. at 1160 (*quoting* Restatement (Second) of Torts, § 564A(b)).

Several of Defendants' statements in Chapter Six of *The Big Short* do not satisfy the "of and concerning" requirement because they are directed towards CDO managers as a group. Plaintiffs contend that "[b]y constantly shifting focus between plaintiffs and CDO managers generally, the book leaves no doubt that its criticisms apply to both." Pl. Mem. at 55. Plaintiffs cannot, however, merely allege that every unflattering comment made about CDO managers in *The Big Short* is a personal libelous accusation concerning Chau simply because Chau is a CDO manager who appears as a central representative character in Chapter 6. Statements 1, 9, 10, 11, 12, 13, and 21 do not meet the "of and concerning" requirement because they refer either to CDO managers generally or to the industry as a whole, and are thus not actionable.

## IV. STATEMENTS NOT SUSCEPTIBLE TO ANY DEFAMATORY MEANING (Statements 1, 8, 14, 16, 20, 23, 24, 25, 26)

It is the responsibility of the Court to determine whether or not a challenged statement is "reasonably susceptible to the defamatory meaning imputed to it." *Levin*, 119 F.3d 189, 195 (*citing James v. Gannett Co.*, 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834, 837–38 (1976)). Where a statement is susceptible of only a single meaning, the court "must determine, as a matter of law, whether that one meaning is defamatory." *Davis v. Ross*, 754 F.2d 80, 83 (2d Cir. 1985); *Aronson v. Wiersma*, 65 N.Y.2d 592, 493 N.Y.S.2d 1006, 483 N.E.2d 1138, 1139 (1985). If a challenged statement is reasonably susceptible of more than one meaning, at least one of which is not defamatory, "it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." *Davis*, 754 F.2d at 83.

In this analysis, the Court must approach the contested statements from the perspective of an average reader:

In analyzing the words in order to ascertain whether a question of fact exists for resolution upon trial, the court will not

pick out and isolate particular phrases but will consider the publication as · a whole. The publication will be tested by its effect upon the average reader. The language will be given a fair reading and the court will not strain to place a particular interpretation on the published words. The statement complained of will be read against the background of its issuance with respect to the circumstances of its publication. It is the duty of the court, in an action for libel, to understand the publication in the same manner that others would naturally do. The construction which it behooves a court of justice to put on a publication which is alleged to be libelous is to be derived as well from the expressions used as from the whole scope and apparent object of the writer.

*James,* 40 N.Y.2d at 419–20, 386 N.Y.S.2d at 874–75, 353 N.E.2d at 838 (internal quotation marks and citation omitted).

 A careful review of Chapter 6 of *The Big Short* indicates that the challenged statements are incapable of being reasonably susceptible to any defamatory meaning. For instance, an average reader would not impute any defamatory meaning to Eisman's lack of knowledge about CDO managers (Statement 1). That Eisman was unaware of what CDO managers did, or whether CDOs needed managing, does not impugn Chau's reputation or character. Likewise, Eisman alleging that Chau told him that he "sold everything out" (Statement 8), whether true or false, is not an accusatory fact that has defamatory meaning. Regardless of whether the phrase "sold everything out" means that Chau had equity and then sold it, never had equity at all, or had very little equity, none of these interpretations are actionable. As businesses may have various reasons for choosing not to maintain equity in their investors' investments, such an ob-

servation, whether true or not, cannot serve as an indictment of one's character. In the¹ same vein, the notion that Chau passed all the risk of default for home loans to the big investors is not susceptible to defamatory meaning.

. The first assertion in Statement 16, that Chau's goal "was to maximize the dollars in his care" is also not reasonably susceptible to any defamatory meaning. No reasonable reader would interpret this statement to mean anything other than that Chau strove to make as much money for himself and his investors as possible. The second assertion in Statement 16, that "Harding Advisory would be the world's biggest subprime CDO manager", is similarly non-actionable. An assertion simply states that Harding succeeded in its industry is not susceptible to any defamatory meaning. Likewise, in Statement 20, Lewis relays part of a conversation in which Chau says to Eisman, "I love guys like you who short my market. Without you I don't have anything to buy." No part of this statement, even in the context of the rest of the chapter, accuses Chau of any despicable conduct.

 Eisman's statements that Chau told him "he would rather have $50 billion in crappy CDOs than none at all, as he was paid mostly on volume" (Statement 23), and that his "main fear was that the U.S. economy would strengthen, and dissuade hedge funds from placing bigger bets against the subprime mortgage market" (Statement 24) are both not reasonably susceptible to defamatory meaning. That Chau preferred to manage *some* CDOs, as opposed to *no* CDOs, hardly casts aspersion on his character. Finally, Eisman's comments to Lippman about "shorting" whatever Chau was buying (Statement 25), and Lewis's statement that Eisman ultimately did so ("Statement 26"),

are not susceptible to any defamatory meaning. Eisman's statement that he wished to short Chau's investments does not defame Chau.

Chau was one of the largest CDO managers of sub-prime mortgage-backed securities. Many now view investments in subprime mortgage bonds, and their subsequent disastrous default, as significantly responsible for the greatest economic crisis since the Great Depression. It is understandable that those who were directly involved in such investment activity might fairly or unfairly be targets of public criticism. Chau's attempt to shift blame for the negative image now publically ascribed to that activity, and those who engaged in it, to the author and his source in the form of a libel suit, is unsupported by law or fact.

## CONCLUSION

Defendants' motions for summary judgment are GRANTED.

SO ORDERED.